Stephen Brent **O'NEILL** a/k/a Brent V. O'Neill, on behalf of himself and on behalf of a class of similarly situated persons, Plaintiff,

v.

THE HOME DEPOT U.S.A., INC., a Delaware corporation, Defendant.

No. 05–61931–CIV–ALTONAGA/Turnoff.

United States District Court, S.D. Florida, Miami Division.

Dec. 27, 2006.

Order Denying Reconsideration Jan. 9, 2007.

Lawrence Steven Klitzman, Lawrence Klitzman PA, Weston, FL, for Plaintiff.

Catharine B. Wooten, Dwight J. Davis, S. Stewart Haskins, II, King & Spalding, Atlanta, GA, Daniel Brandon Rogers, Edward A. Moss, Eileen Tilghman Moss, Shook Hardy & Bacon LLP, Miami, FL, for Defendant.

## ORDER DENYING MOTION FOR CLASS CERTIFICATION

ALTONAGA, District Judge.

**THIS CAUSE** came before the Court upon Plaintiff, Stephen Brent O'Neill's ("O'Neill['s]") Motion for Class Certification [D.E. 58], filed on May 24, 2006. On August 28, 2006, the Court heard oral argument on Plaintiff's Motion. The Court has carefully considered the parties' written submissions, oral argument by counsel, and pertinent portions of the record.

## I. BACKGROUND

### A. *Plaintiff's Allegations*

The First Amended Complaint ("FAC") is brought as a purported class action on behalf of Florida customers who rented tools and other equipment from Defendant, The Home Depot U.S.A., Inc. ("Home Depot") (*See FAC* [D.E. 45] at ¶ 1). The FAC alleges that Home Depot has a policy of adding a ten percent "damage waiver" charge to rental contracts, purporting to protect the customer if the item being rented is damaged. (*See id.* at ¶ 2). This policy allegedly is a deceptive and unconscionable practice in violation of the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), §§ 501.201–213, Fla. Stat., because (1) the damage waiver is sold as a "negative option," in that Home Depot automatically includes the charge in every contract, without asking customers whether they want it, and without disclosing that it is optional; (2) the damage waiver is virtually of no value, because it contains exclusions that negate the coverage being provided; and (3) Home Depot conceals the non-existent scope of the coverage provided by the damage waiver by placing the only statement of the coverage it provides in boilerplate contractual terms and conditions that customers are not given until after they have agreed to the rental contract. (*See id.*).

O'Neill, on behalf of himself and others similarly situated, seeks the following relief: a declaratory judgment (Count I) that the foregoing constitutes an unconscionable, unfair or deceptive act or practice; injunctive relief (Count II), permanently enjoining Home Depot from continuing to engage in acts and practices relating to the damage waiver, which constitute a violation of the FDUTPA; damages (Count III) sustained as a result of Home Depot's alleged violation of the FDUTPA; and damages (Count IV) for Home Depot's alleged violation of the Uniform Commercial Code, Fla. Stat. § 680.1081, because Home Depot's practices are unconscionable.

### B. *The Factual Record Developed for Class Certification*

Home Depot rents a wide variety of tools at 87 tool rental centers located throughout Florida. (*See Opp. Mot. Class Cert.* at 4; *Lewis Decl.,* Exh. "1"). Before a customer may rent a tool, a Home Depot associate must determine that the customer meets certain criteria. (*See id.*). This process includes verifying the customer's ability to pay, determining the work to be performed and the suitability of the tool for that work, and instructing the customer on the proper use and care of the tool. (*See id.; Bogle Decl.,* Exh. "2").

As part of the tool rental process, a written contract is created and executed at the time the customer rents a tool from Home Depot. (*See id.*) The rental agreement consists of three pages. First, there is the store copy, which includes the customer's name, the rental rate, a special terms and conditions section, and a signature line. (*See Standard Operating Procedures ("SOP"),* Exh. "7," pp. 46–48). Second, there is a customer copy, which contains the same information as the store copy (minus the signature line), some safety information, and a second page (the "Terms and Conditions page"). (*See id.; Exh.* "8"). Home Depot notes that, contrary to Plaintiff's allegations, it is Home Depot's

policy to provide the customer all pages of the agreement, including the Terms and Conditions page, at the same time. (*See id.; Lewis Decl.*, Exh. "1," ¶ 14). The Terms and Conditions page describes the damage waiver and informs the customer that the damage waiver is optional. (*See id.; Post March 2005 Rental Agr., Terms and Conditions,* Exh. "8," ¶ 11).

Prior to March 2005, Home Depot's damage waiver stated as follows:

> If I pay the damage waiver charge for any Equipment, this agreement shall be modified to relieve me of any liability for accidental damage to it, but not for any losses or damages due to theft, burglary, misuse or abuse, theft by conversion, intentional damage, disappearance or any loss due to my failure to care properly for such Equipment in a prudent manner (including without limitation by using proper fuel, oil and lubricants and not exceeding such Equipment's rated capacity, if applicable).

(*Opp. Mot. Class Cert.* at 9; Exh. "10"). In March 2005, Home Depot modified the damage waiver provision in its rental contract to read as follows:

> Damage Protection is an optional service offered by Home Depot to cover repair or replacement charges if the equipment rented from Home Depot is damaged during normal use. The charge for the Damage Protection service is 10% of the tool rental fee and will appear as a separate line-item on the invoice. Damage Protection is not insurance. Damage Protection only covers the costs of repair or replacement of the rented equipment damaged during normal use of the equipment. Damage Protection does not cover loss of or damage to the equipment during transport or loss or damage to the equipment caused by theft, abuse, misuse, neglect, intentional acts or failure to follow the instructions provided for proper use and care of the rented equipment.

(*Id.;* Exh. "8").

According to Plaintiff, without the damage waiver offered by Home Depot, a renter is liable only for repairs caused by "improper use." (*See Mot. Class Cert.* at 5). The damage waiver excludes coverage for all repairs necessitated by the renter's "misuse." (*See id.*). Thus, Plaintiff concludes, the damage waiver fully and completely excludes from its protection the only liability the renter even has under the contract—damage due to the renter's "misuse" or "improper use" of the equipment. (*See id.*). Home Depot maintains that the damage waiver relieves the customer of liability for damage to the tool caused during its normal use. (*See Opp. Mot. Class Cert.* at 5 (citing *McAreavey Dep.* at 12:12–14, 27:16–18, Exh. "4")).

In April of 2005, Home Depot introduced a new Terms and Conditions section. (*See id.*). According to Plaintiff, while the damage waiver language was modified, the substance remains the same. (*See id.* at 6). "The new 'damage protection' still excludes repairs necessitated by 'misuse,' which means the damage waiver provides no protection for the only potential liability the renter has under the contract." (*Id.*).

It is Home Depot's policy to ask the customer if he or she wants to purchase the damage waiver. (*See Bogel Decl.*, Ex. "2," ¶ 8). The manner in which associates offer and explain the damage waiver varies, but Home Depot's policy is to pose the question to the customer before the rental contract is created to make it clear that the damage waiver is optional. (*See id.* at ¶ 6; *Lewis Decl.*, Exh. "1," ¶¶ 9, 15).

Home Depot has a written Standard Operating Procedure for all rental transactions. (*See Mot. Class Cert.* at 6). There have been two versions of the SOP during the Class Period,[1] one effective June 7, 1999, and a second, effective January 10, 2006. (*See id.*).

The 1999 SOP states that early in the sales process, the Home Depot employee should "[i]nform the customer about the benefits of accepting the Damage Waiver option on the Rental Agreement. Quote price (not a percentage) to the customer for the Damage Waiver." (*Id.; SOP,* Exh. "7"). When an

---

1. The proposed class period is from November 30, 2000 to April 30, 2006. (*See Opp. Mot. Class Cert.* at 8 n. 2).

actual rental contract is provided to the customer for signature, the employee is instructed to once again "[e]xplain to the customer what the Damage Waiver covers. Discuss the benefits of having the Damage Waiver as part of the contract." (*Id.*).

After the customer is given the opportunity to review the entire rental agreement, the Home Depot associate should review the rental agreement with the customer, highlighting certain terms, such as the rental rate, the date and time the tool is due to be returned, and Home Depot's telephone number. (*See Bogle Decl.*, Exh. "2," ¶¶ 11–12; *Freeman Decl.*, Exh. "6," ¶¶ 10–11). The associate is instructed to discuss with the customer each of the special terms and conditions, including whether the customer has elected to purchase the damage waiver. (*See id.*).

Home Depot further instructs associates to "[c]ircle the Damage Waiver provision in the Special Terms and Conditions section of the agreement." (*SOP*, Exh. "7" at 2:35). The associate is required to "[e]xplain to the customer what the Damage Waiver covers." (*Id.*). Additionally, even when the customer has orally agreed to purchase the damage waiver, when reviewing the agreement with the customer, the associate should again "[a]sk the customer if they [sic] want the Damage Waiver." (*Id.*). The associate is further instructed that "if they do not want the Damage Waiver, remove the fee from the contract. Reprint the contract if necessary." (*Id.*).

Once the rental agreement reflects the customer's choice regarding the damage waiver, the customer is asked to confirm this decision by initialing the agreement adjacent to the following text: "I have read and agree, as initialed to the right, to these special terms and conditions." (*Id.* at 2:45). The customer should also be asked to sign the rental contract, acknowledging agreement "to the terms and conditions of this page and the other page(s) of this agreement." (*Id.*; Exh. "10").

Home Depot displays signs in each tool rental center that inform customers about the damage protection Home Deport offers. (*See id.*; Exh. "11"). These signs remind customers that the damage protection is an optional service offered by Home Depot and describe the scope of the protection. (*See id.*).

When the customer returns a rented tool, the rental charges are calculated and an invoice is prepared. A Home Depot associate inspects the tool to determine if it was damaged by the customer. (*See Bogle Decl.*, Exh. "2," ¶ 17). If a customer who purchased the damage waiver returns a damaged tool, the Home Depot associate must determine whether the damage occurred during normal use of the tool (and therefore, according to Home Depot, is covered by the damage waiver) or was caused by misuse of the tool (which, according to Home Depot, is not covered). (*See Opp. Class Cert.* at 11; *Bogle Decl.*, Exh. "2," ¶¶ 19, 21). This determination depends on the associate's application of the contract terms to the circumstances of the particular rental. (*See id.* at ¶¶ 18–20; *Freeman Decl.*, Exh. "6," ¶¶ 20–22). The decision is made on a case-by-case basis, considering the type of tool, the job for which it was used, the damage to the tool, and the customer's explanation of the cause of the damage. (*See id.*). The tool rental associate has wide discretion to decide whether the damage is covered by the waiver. (*See id.*; *Lewis Decl.*, Exh. "1," ¶ 16).

When an associate determines that damage to a rented tool is covered by the damage waiver, the customer should not be charged for the damage and no repair costs should be added to the rental invoice. (*See id.*; *Lewis Decl.*, Exh. "1," ¶ 19). Regardless of whether the tool is damaged, the customer should be asked to sign the rental invoice (which includes and discloses the charge for the damage waiver), acknowledging that the total charges on the invoice are correct. (*See GCR 8/13/04 Rental Inv.*, Exh. "14").

O'Neill rented tools from Home Depot stores on at least two separate occasions. (*See FAC* ¶¶ 8, 20; *Rental Agr. 6/20/04*, Exh. "10;" *Rental Agr. 8/13/04*, Exh. "16"). The first rental occurred on June 20, 2004, when O'Neill rented a saw. (*See id.*; *O'Neill Dep.*, March 23, 2006, 31:22–32:4, Exh. "15"). O'Neill was assisted by a Home Depot associ-

ate who helped him select the appropriate saw for his stated use and explained the cost to rent the saw. (*See id.* at 42:15–23; 43:12–17). Another associate at the tool rental counter asked O'Neill for his driver's license and credit card. (*See id.* at 46:21–23; 47:21–48:4). O'Neill presented a credit card in the name of Gold Coast Racing, Inc.[2] (*See id.* at 45:10–13; 47:3–4). O'Neill claims the associate(s) did not ask if he wanted to purchase the damage waiver, as is required by Home Depot. (*See id.* at 62:21–63:4).

Plaintiff admits that Home Depot presented him with a rental agreement that included the following language: "I accept the benefits of the Damage Waiver (if applicable) described in paragraph 11 in the Terms and Conditions of this Rental Agreement." (*Rental Agr. 6/20/04,* Exh. "10"). O'Neill further admits that he initialed that section, expressly acknowledging that he did "read and agree, as initialed to the right, to these special terms and conditions," which included his agreement to purchase the damage waiver. (*O'Neill Dep.,* March 23, 2006, 56:24–57:18, Exh. "15"). The fee for the waiver ($3.90) was listed on the rental agreement next to the words "Damage Waiver." (*See Rental Agr. 6/20/04,* Exh. "10"). O'Neill also signed the bottom of the rental agreement, signifying his assent to all the terms and conditions printed on the page, including the amount charged for the damage waiver. (*See id.*).

O'Neill claims that he initialed and signed the agreement without ever reading it. (*See O'Neill Dep.,* March 23, 2006, 50:14–51:8; 65:25–66:2, Exh. "15"). He maintains that no one informed him that the damage waiver was optional, but also admits that no one told him the damage waiver was mandatory. (*See id.* at 62:3–11). O'Neill further admits that if he had read the rental agreement, he would have known he was charged for a damage waiver. (*See id.* at 58:25–59; 76:10–12). He claims, however, that if he had read the agreement, he would have asked Home Depot to remove the damage waiver. (*See id.*).

O'Neill does not recall seeing any signs posted at the Home Depot store concerning the damage waiver. (*See O'Neill Dep.,* March 23, 2006, 50:7–10; 85:1–10, Exh. "15"). According to O'Neill, he learned that the damage waiver charge had been included on his rental agreement when his wife brought it to his attention after the rental. (*See id.* at 51:23–25, 52:1–10). O'Neill's wife does not recall ever having read the rental agreement or even having discussed the damage waiver with him. (*See Gwenn O'Neill Dep.,* April 27, 2006, 30:21–31:1; 31:17–23, Exh. "17").

O'Neill contends that after he signed the agreement, an associate gave him instructions on how to operate, refuel and clean the saw, and explained that Plaintiff would be charged a cleaning fee if he returned the saw dirty. (*See id.* at 44:1–5, 60:22–61:14). Although Plaintiff alleges that Home Depot does not provide customers with the Terms and Conditions page before they are asked to sign the agreement, O'Neill testified that he could not recall if he had been given this page when he signed the rental agreement. (*See id.* at 64:6–18). Nevertheless, when O'Neill left Home Depot he had the Terms and Conditions page of his rental agreement. (*See id.* at 64:19–25, 65:11–24).

O'Neill returned the saw on June 20, 2004. (*See id.* at 76:13–15). A Home Depot associate inspected the tool to make sure that it was not damaged and that it had been cleaned. (*See id.* at 80:24–25, 81:1–4). O'Neill had not damaged the saw and was not charged for any damage. (*See id.* at 76:16–25, 77:5–7). After the tool was inspected, O'Neill was given a rental invoice which contained the rental charges and again disclosed that he had been charged $3.90 for the damage waiver. (*See id.* at 78:12–21; 79:2–4). Thereafter, O'Neill signed an invoice which states: "I acknowledge that . . . the above total charges are correct." (*Id.* at 79:5–12; *Post March 2005 Rental Agr., Terms and Conditions,* Exh. "8"). Plaintiff did not speak to anyone at Home Depot about the damage waiver, complain about it, or ask that the damage waiver charge be

**2.** Suit was originally filed in the name of Gold Coast Racing, Inc., a non-existent entity which was later substituted by its owner, O'Neill. (*See* [D.E. 71]).

removed. (*See O'Neill Dep.*, March 23, 2006, at 53:4–17; 80:3–12).

On August 13, 2004, Plaintiff again rented a saw from Home Depot. (*See id.* at 88:6–20; *Rental Agr. 8/13/04,* Exh. "16"). On that occasion, O'Neill spoke with Home Depot concerning his need for the tool. An associate helped him choose the appropriate saw, showed him how to operate it, and explained the cleaning fee if the saw was returned dirty. (*See O'Neill Dep.*, March 23, 2006, 89:8–15, 23–24, 90:4–16).

O'Neill claims that a Home Depot associate prepared a rental agreement that included a damage waiver and handed it to him to sign without asking him about the waiver. (*See id.* at 91:1–7). He further claims that he told the Home Depot associates that he did not want the damage waiver for his rental, but they refused to remove it. (*See id.* at 92:2–9, 14–25). O'Neill signed the rental agreement and initialed the "Special Terms and Conditions" box, expressly agreeing to pay $4.30 for the damage waiver. (*See id.* at 94:1–21, 99:14–25, 100:1–12). Defendant provided him the Terms and Conditions page. (*See id.* at 97:16–21).

On August 14, 2004, Plaintiff returned the saw. (*See id.* at 98:13–17). An associate inspected the saw, found no damage, and did not charge Plaintiff for any repairs. (*See id.* at 98:20–25, 99:4–6). O'Neill did not speak to anyone about the damage waiver or ask Home Depot to remove the damage waiver fee. (*See id.* at 99:7–10, 101:13–15). Thereafter, Plaintiff signed the invoice, acknowledging that the charges were correct. (*See id.* at 100:8–12).

Plaintiff seeks certification of a class of "Florida customers who purchased damage waivers beginning on November 30, 2000," five years prior to the filing of this action, based on the longest applicable statute of limitations. (*Mot. Class Cert.* at 3; *FAC* ¶ 21). In the FAC (and in his arguments for class certification), Plaintiff maintains that the following constitute some of the common questions of law and/or fact that are raised in the case:

a. Whether Home Depot has a policy of including Damage Waiver charges in Rental Agreements without first asking customers if they wish to purchase that protection.

b. Whether Home Depot has a policy of including Damage Waiver charges in Rental Agreements without disclosing that the charge is optional.

c. Whether Home Depot has a policy of requiring customers to pay for the Damage Waiver charge before furnishing the customer with the separate page of the Rental Agreement which contains the Damage Waiver language.

d. Whether Home Depot's policy of packaging the Damage Waiver charge in Rental Agreements without asking customers if they wish to purchase that protection is an unconscionable, unfair or deceptive act or practice which violates the Florida Deceptive and Unfair Practice Act. . . .

e. Whether Home Depot's policy of packaging the Damage Waiver charge in Rental Agreements without disclosing that the charge is optional is an unconscionable, unfair or deceptive act or practice. . . .

f. Whether Home Depot's practice of requiring the customer to pay for the Damage Waiver prior to furnishing the customer with a separate page of terms and conditions which contains the Damage Waiver is an unconscionable, unfair or deceptive act or practice. . . .

g. Whether Home Depot's Damage Waiver provision in its Rental Agreements is unconscionable under Florida Statute 680.1081. . . .

(*FAC* ¶ 23).

## II. ANALYSIS

### A. *Introduction.*

According to Plaintiff, Home Depot's damage waiver is a sham product that is sold through deceptive methods. "Through obscure but carefully crafted contractual provisions [ ] Home Depot has designed the damage waiver so that it provides no actual protection." (*Mot. Class Cert.* at 1). Plaintiff further claims that even if the damage waiver provides some degree of protection, no customer truthfully informed about the scope of the damage waiver would voluntari-

ly purchase it. Home Depot then allegedly "compounds" the dishonest nature of the product by setting up a sales system which makes a reasonable customer believe that the damage waiver is a required charge, when it is in fact an optional item. (*See id.*). O'Neill argues that a challenge to this kind of conduct is particularly well-suited for a class action because he is challenging a corporate policy.

"The decision to certify is within the broad discretion of the district court...." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir.2004) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996)). With this "great power comes great responsibility; the awesome power of a district court must be 'exercised within the framework of rule 23.'" *Id.* Thus, to be entitled to class certification, the party seeking certification must have standing and must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as the requirements of at least one subsection of Fed. R.Civ.P. 23(b). *See Klay*, 382 F.3d at 1250.

Under Federal Rule of Civil Procedure 23(a), the party seeking class certification has the burden of showing that the four requirements of numerosity, commonality, typicality and adequacy of representation are satisfied. Rule 23(a) provides as follows:

> One or more members of a class may sue on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims and defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

See Fed.R.Civ.P. 23(a).

Plaintiff insists he and the purported class have satisfied the requirements of Rule 23(a). According to O'Neill, in 2005 the damage waiver was purchased as part of 615,615 rental transactions in Florida and joinder of all of the purchasers of the damage waivers

is impracticable. He also argues that the claims present the common issues detailed above (quoted from his First Amended Complaint). (*See also Mot. Class Cert.* at 13–14). O'Neill further contends that his claims are typical of the class as a whole, and that there are no conflicts between his claims and the claims of other class members. O'Neill lastly maintains that he has hired counsel with long experience in class actions who are prepared to vigorously prosecute this case, thereby satisfying the adequacy requirement of Rule 23(a). (*See id.* at 14–15).

As to satisfying at least one subdivision of Rule 23(b), Plaintiff maintains that he and the proposed class satisfy subdivision (b)(3).[3] Federal Rule of Civil Procedure 23(b) states in pertinent part that an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied as well as the following subdivision:

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b).

Home Depot raises several arguments in opposition to class certification. Home Depot insists that Plaintiff is not an adequate representative for the proposed class because he lacks standing. Home Depot emphasizes that common questions between Plaintiff and the proposed class do not predominate, that

---

**3.** Other than reserving the right to seek certification under Rule 23(b)(2) for the injunctive and declaratory relief sought in the FAC (*see Mot. Class Cert.* at 13 n. 7), Plaintiff does not engage in any analysis of how class certification is appropriate under Rule 23(b)(1) or (2). Therefore, only the predominance inquiry of Rule 23(b)(3) is addressed in this Order.

each claim will require individualized fact finding, and that the claims are subject to unique defenses. Home Depot also argues that there are significant conflicts of interest between the named Plaintiff and the proposed class members, and that Plaintiff has not shown that he will adequately prosecute the action and protect the interests of the class.

### B. Plaintiff has standing to represent some of the proposed class members.

Home Depot's challenge to Plaintiff's standing is readily addressed, and disposed of. Home Depot initially argued that Gold Coast lacked standing to bring the claims alleged because it was a fictitious or nonexistent corporation at the time the agreements were executed. (*See Resp. Mot. Class Cert.* at 19). Because O'Neill has since been substituted as Plaintiff in the place of Gold Coast (*see* [D.E. 71]), however, this argument fails.

■ Similarly, Home Depot's argument that O'Neill lacks standing because the rental agreements and the rental invoices show Gold Coast as the party renting the tools, has no merit. Courts have recognized that an individual doing business as a corporation that was not incorporated has standing to sue on a contract entered into by the corporation. *See Slamecka d/b/a T. Slamecka, Inc. v. Empire Kosher Poultry, Inc.,* 2004 WL 1470026 at *3 (N.D.Ill.2004) (denying motion to dismiss based on lack of standing where case had been filed by plaintiff individually, contract at issue had been signed by plaintiff as president of the corporation, and corporation had not been properly incorporated at the time the contract was executed); *see also Forbes v. Lewis Bear Co.,* 524 So.2d 1098, 1099 (Fla. 1st DCA 1988) (affirming lower court's finding that owners and operators of a business which was not in existence during the relevant time period were individually liable); Fla. Stat. § 607.0204 ("All persons purporting to act as or on behalf of a corporation, having actual knowledge that there was no corporation under this chapter, are jointly and severally liable for all liabilities created by so acting. . . ."). Accordingly, O'Neill is permitted to bring an action, individually, on these rental agreements, *see Sla-*

*mecka,* 2004 WL 1470026 at *3, and may seek to represent a class of those who have the same claims, under similar factual circumstances, as he.

### C. Plaintiff's proposed definition of the class is inadequate.

■ Before analyzing the Rule 23(a) requirements, or as part of the numerosity inquiry, a court must determine whether the class definition is adequate. *See, e.g., Perez v. Metabolife Int'l., Inc.,* 218 F.R.D. 262, 269 (S.D.Fla.2003) (analyzing class definition as a separate question prior to analyzing the Rule 23(a) prerequisites) (citing *Mauldin v. Wal-Mart Stores, Inc.,* No. 01–CV–2755, 2002 WL 2022334 at *5 n. 2 (N.D.Ga.2002) (court noted that adequacy of class definition may be considered as part of numerosity inquiry although courts have found it to be a separate question)). "A vague class definition portends significant manageability problems for the court." *Rink v. Cheminova, Inc.,* 203 F.R.D. 648, 660 (M.D.Fla.2001).

The proposed class consists of "Florida customers who purchased damage waivers beginning on November 30, 2000." (*Mot. Class Cert.* at 3). The proposed class definition is inadequate because it is overly broad in relation to the issues O'Neill raises. By its very terms, the class definition includes individuals who may have benefitted from the same actions which form the basis of Plaintiff's claims and individuals who may have been informed by Home Depot about the details of the damage waiver, contrary to Plaintiff's experiences. By Plaintiff's own definition, the proposed class would include many customers who, in contrast to Plaintiff, knew the damage waiver was optional, as well as understood the scope of the coverage (because, for example, they read the rental agreement or were informed by a Home Depot employee or because they reviewed information displayed at a Home Depot store), and chose to purchase the waiver. (*See Def. Resp. Mot. Class Cert.* at 22). Plaintiff's class definition also includes individuals who may have purchased a damage waiver, and following damage to the rented equipment, were not required to pay for

repairs they otherwise may have been responsible for.[4]

No objective criteria have been proposed to separate the individuals who did benefit from those who did not benefit from the challenged Home Depot practices. No simple test has been suggested to identify individuals who are similarly situated to Plaintiff in their tool-rental experiences with Home Depot. It appears that individual investigations or testimony will therefore be necessary. The problems with ascertaining class membership, given Plaintiff's overly broad definition, counsel against a finding that class certification is appropriate. *See, e.g., Simer v. Rios,* 661 F.2d 655, 669 (7th Cir.1981) (in part because of difficulties in defining the class and identifying its members, class treatment was inappropriate).

### D. *Plaintiff's proposed class fails to meet all the requirements of Rule 23(a).*

■ Even if Plaintiff's proposed class definition was adequate, Plaintiff has not established all of the requirements of Rule 23(a), Fed.R.Civ.P. While numerosity is easily satisfied under Rule 23(a)(1), given the numbers of class members envisioned, commonality (Rule 23(a)(2)) and typicality (Rule 23(a)(3)) are not. "[T]he commonality and typicality requirements of Rule 23(a) overlap. Both requirements focus on whether a sufficient nexus exists between the legal claims of the named class representative and those of individual class members to warrant class certification." *Prado–Steiman v. Bush,* 221 F.3d 1266, 1278–79 (11th Cir.2000). Commonality refers to the class characteristics as a whole and typicality concerns the individual characteristics of the class members in relation to the class. *See Perez,* 218 F.R.D. at 270.

The class claims against Home Depot consist of allegations relating to Home Depot's practices with respect to the damage waiver. O'Neill contends that Home Depot fails to disclose to its customers that the damage waiver is optional. O'Neill also claims that Home Depot purposely avoids informing its customers about the scope of the damage

waiver, and that the waiver itself provides no coverage and therefore is a worthless product. (*See Mot. Class Cert.* at pp. 3–10). Upon a superficial reading, it would appear that questions of fact and law are common to the class, that the claims of the Plaintiff and the claims of the proposed class members are typical, and that defenses to the claims would be common.

However, while there may be some common issues among the proposed class participants, as already described, there are a substantial number of issues that are not common to the class and claims of the Plaintiff, and defenses of Home Depot, that are not typical of all those that may appear. As even Plaintiff recognizes, Home Depot's written policy requires that its sales personnel advise customers that the damage waiver is optional. Customers are supposed to be informed, through rental agreements and signs posted at the individual stores, about the coverage of the waiver and its optional nature. Where these events occurred, a class member does not have a claim, let alone a claim common or typical to those presented by O'Neill.

The differences identified in the proposed class members' individual experiences with the purchase of Home Depot's damage waiver precludes a finding of commonality and typicality. *See Dyer v. Publix Super Markets, Inc.,* 2000 WL 33339613, *4, *9–11 (M.D.Fla.2000) (denying class certification on the basis that plaintiff failed to meet the commonality and typicality requirements of Rule 23(a) and noting that the varying facts and circumstances surrounding many of the proposed class representatives' experiences would require evidence specific to individual plaintiffs and would raise individualized defenses); *Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir.1984) (affirming the district court's denial of class certification because plaintiff failed to satisfy the requirements of commonality and typicality).

■ Defendant will also be litigating unique defenses which emphasize the differ-

---

4. This consideration assumes, without deciding, that Defendant's characterization of the value conferred by the waiver is correct. It does so

because the value (or lack thereof) of the waiver is not an issue the Court may resolve on a class certification motion.

ences among the class members and portend that individual issues are likely to predominate. For example, Plaintiff has admitted that he did not read the rental agreement for the June 2004 tool rental. (*See O'Neill Dep.*, March 23, 2006, 50:14–18, 51:7–22, Exh. "15"). He has also stated that during his second tool rental, Home Depot refused to remove the damage waiver. (*See Mot. Class Cert.* at 14–15). The proposed class, however, includes individuals who did read the rental agreement and/or who asked that the waiver be removed and who had their requests accommodated.

While O'Neill certainly may be typical of *some* of the proposed class members, he is not typical of all the myriad class members who may be encountered. He, therefore, cannot show that he "will fairly and adequately protect the interests of the class," as is required under Rule 23(a)(4). Given the likelihood of varied circumstances of the proposed class members, facts that support one class member's alleged claim may adversely affect another member's claim (*e.g.*, there may be class members who purchased the damage waiver and were not charged when their equipment malfunctioned). *See Dyer*, 2000 WL 33339613 at *9–11; *see also In re Terazosin Hydrochloride*, 220 F.R.D. 672, 692 (S.D.Fla.2004) (recognizing that individuals who suffered no economic injury due to the alleged wrongful conduct, and who in fact benefitted from that conduct, are not proper class members); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir.2000) ("[A] class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class.") (citations omitted).

**E.** *Common questions of law and of fact do not predominate, as is required by Rule 23(b)(3).*

█ While the foregoing analysis of the Rule 23(a) requirements shows that class certification is not appropriate, an examination of the elements of Rule 23(b)(3) reinforces this conclusion. Certification under Fed.R.Civ.P. 23(b)(3) requires that common questions of law or fact predominate and that

class treatment be superior to other methods of adjudicating class members' claims. "The predominance inquiry ... is far more demanding than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997).

A class is certifiable under Rule 23(b)(3) where the issues in the action that are subject to generalized proof predominate over the issues that will require individualized proof. *See Motel 6 Multipurpose*, 130 F.3d at 1005. "In order to 'predominate,' common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986). "In finding that common questions predominate over individual ones ..., courts have pointed to such issues that possess the common nucleus of fact for all related questions, have spoken of a common issue as the central, or overriding question, or have used similar articulations." 1 Herbert Newberg & Alba Conte, *Newberg on Class Actions* §§ 4.254–85 to 4–86 (2d ed.1985). The purpose of the predominance inquiry is to determine "whether the individual questions in a case are so overwhelming as to destroy the utility of the class action." *Partain v. First Nat'l Bank*, 59 F.R.D. 56, 59 (M.D.Ala.1973).

Moreover, "[i]n determining whether class or individual issues predominate in a putative class action suit, we must take into account 'the claims, defenses, relevant facts, and applicable substantive law,' *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996), to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." *Klay*, 382 F.3d at 1254. While class members need not be *identically* situated upon all issues, the individual issues "must be of lesser overall significance." *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332, 340 (D.N.J.1997).

The Eleventh Circuit has explained that "[c]ommon issues of fact and law predominate if they 'ha[ve]' a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Ingram v. Coca–Cola Co.*, 200 F.R.D. 685, 699 (N.D.Ga.2001). Where, after adjudica-

tion of the class-wide issues plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under rule 23(b)(3).

*Klay,* 382 F.3d at 1255; *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228, 1234 (11th Cir.2000) ("Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.").

According to O'Neill, a common claim among the members of the proposed class is whether Home Depot has a practice of failing to disclose the optional nature of the damage waiver. (*See Mot. Class Cert.* at 9; *FAC* ¶ 23). Plaintiff explains that "Home Depot has a paper policy of telling customers that the damage waiver is optional, but in reality the contract creation process is rigged so that customers appear to have no choice but to 'accept' the damage waiver." (*Mot. Class Cert.* at 11). While Plaintiff concedes that Home Depot's Standard Operating Procedures require the disclosure that the damage waiver is optional, Plaintiff maintains that is not the case in practice. (*See id.*). Thus, Plaintiff's claim is not based on Home Depot's policy about the damage waiver, but rather rests on alleged violations by Home Depot employees of the written policy.

Because the class allegations are based on the actions of individual Home Depot employees, in order to establish the proposed class claim, O'Neill would have to demonstrate that each individual class member was misled by a Home Depot employee when that member rented equipment from Home Depot. Plaintiff would necessarily have to show that every time a class member rented a tool or equipment from Home Depot, the member was never informed about the optional nature of the damage waiver, in violation of Home Depot's written policy. (*See SOP,* Exh. "7," at 2:35). This is a highly individualized claim that would require numerous individual verbal accounts as to what occurred and the conversations that took place with Home Depot employees on the day(s) equipment was rented. Courts have consistently rejected requests to certify such types of claims. *See Montgomery, Jr. v. The New Piper Aircraft, Inc.,* 209 F.R.D. 221, 229 (S.D.Fla.2002) (denying motion for class certification and noting that "An action based substantially on oral rather than written communications is inappropriate for treatment as a class action.") (citing *Johnston v. HBO Film Mgm't., Inc.,* 265 F.3d 178 (3d Cir.2001)); *see also Broussard v. Meineke Discount Muffler Shops,* 155 F.3d 331, 341 (4th Cir.1998) (reversing district court's decision to certify class and noting that " 'claims based substantially on oral rather than written communications are inappropriate for treatment as class actions unless the communications are shown to be standardized.' ") (citing *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482 F.2d 880, 882–83 (5th Cir.1973), and *Retired Chicago Police Ass'n. v. City of Chicago,* 7 F.3d 584, 597 n. 17 (7th Cir.1993)); *Rhodes v. Cracker Barrel Old Country Store,* 2002 WL 32058462 at \*59 (N.D.Ga.2002) (recommending denial of class certification in proposed class discrimination action and explaining that the proposed class plaintiffs were not challenging company policy, but rather the respective violations by various employees of such policy, and finding that the specific circumstances and individualized proof necessary to evaluate plaintiffs' claim were "incommensurate with the type of central determination for which class certification was designed to create efficiency.").

Although the foregoing should be sufficient to illustrate the Rule 23(b)(3) concerns, a review of the proof necessary to support the FDUTPA claim in Count III provides further support for the conclusion to deny certification. Under FDUTPA, proof of causation is required. To prove liability under FDUTPA, it would have to be shown that: (1) each proposed class member was never informed about the optional nature of the damage waiver, an act alleged to constitute a deceptive trade practice; and (2) that such act by Home Depot caused each proposed class plaintiff damage. *See Montgomery, Jr.,* 209 F.R.D. at 229 (citing *Hubbel v. Aetna Casualty & Surety Co.,* 758 So.2d 94 (Fla.2000) (noting that the "obvious purpose of FDUTPA is to make consumers whole for losses

caused by fraudulent consumer practices")). "Such inquiries would result in a series of mini-trials for each putative class member on the issue of causation, which strongly militates against a finding of predominance." *Id.* at 230 (citing *Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours and Company, Inc.*, 1994 WL 1251231 (S.D.Fla.1994); *Neenan v. Carnival Corp.*, 199 F.R.D. 372 (S.D.Fla.2001)). Individual fact-finding would also be required to determine whether any particular class member received an alleged misrepresentation from Home Depot and suffered any damage.

Nor has Plaintiff shown how, through common proof, he will be able to establish that Home Depot withheld information about the optional nature of the damage waiver from the proposed plaintiffs. *See Montgomery*, 209 F.R.D. at 229. O'Neill even concedes that "[t]here may be instances in which individual sales representatives rose above Home Depot's deceptive practice and truly disclosed the fact that the charge was optional and could be removed." (*Mot. Class Cert.* at 19). Further, as Defendant notes, other individual determinations will need to be made to resolve Plaintiff's claim regarding the disclosure of the optional nature of the waiver, such as whether each class member read the rental agreement and/or the damage protection sign, and if so, whether or not each knew from the contract language or from the sign that the damage waiver was optional. (*See Opp. Class Cert.* at 32).

Similarly, whether Home Depot disclosed to the proposed class the scope of the damage waiver will require individual inquiries. Defendant will want to explore the interactions between a class member and a Home Depot employee (every time a proposed plaintiff rented equipment from Home Depot) to defend O'Neill's claim that Home Depot consistently neglects to inform its customers about the scope of the damage waiver.[5] Because the Terms and Conditions sec-

tion of the rental agreement explains the scope of the waiver, as does a sign required to be posted at the Home Depot facilities, even if a sales associate neglected to inform the customer about the scope of the damage waiver, Defendant will want to examine whether the customer nevertheless learned of the scope of the waiver through other documents and/or signs. Additionally, for those proposed class members, such as O'Neill, who rented tools from Home Depot on multiple occasions, a relevant inquiry for the Defendant may be whether they learned about the scope of the damage waiver after the first time they rented a tool, even if, as alleged, they were not informed about the scope of the waiver every time they were serviced by Home Depot.

The final point to address is Plaintiff's argument that the damage waiver is a worthless product, and that this "claim" merits class treatment. (*See Mot. Class Cert.* at 14). A worthless product claim, however, is not presented in the FAC, but rather, appears as an element throughout the claims involving Home Depot's "practices and acts." It is not the Court's role to amend the pleading for the Plaintiff to articulate a claim that could meet the requirements of Rule 23 where the causes of action as presented do not.

Nor may the Court certify a single issue when the case as a whole fails to meet the requirements of Rule 23. *See, e.g., Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 (S.D.Ala.2006) (rejecting plaintiffs' argument that shearing individual issues off the case until only common issues remain, and certifying a class for the remainder, is an appropriate and permissible means of compensating for a failure of the case as a whole to comport with Rule 23(b)(3) predominance principles) (citation omitted). "[C]ourts have emphatically rejected attempts to use the (c)(4)[6] process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement." *Id* at 316. *See also Allison v. Citgo Petroleum*

---

5. As stated, it is Home Depot's policy to have a sales associate review with each customer the entire rental agreement, including the scope of the damage waiver. (*See SOP*, Exh. "7" at 2:35).

6. Rule 23(c)(4), Fed.R.Civ.P., states in pertinent part: "When appropriate (A) an action may be

brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

*Co.*, 151 F.3d 402, 422 n. 17 (5th Cir.1998) (cautioning that piecemeal certification of class actions distorts certification process and creates unfairness and uncertainty as to what is at stake in the litigation and whether the litigation will actually resolve the dispute); *Rink*, 203 F.R.D. at 651 (noting that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that "[a] district court cannot manufacture predominance through the nimble use of subdivision (c)(4)") (citation omitted); *Castano*, 84 F.3d at 745 n. 21 (emphasizing that reading Rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); "the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.").

No single set of operative facts in this case determines liability, and individual issues of causation preclude a finding of predominance. Because of the difficulties to be encountered in the management of a class action, *see* Fed.R.Civ.P. 23(b)(3)(D), that presents the foregoing myriad individualized factual and legal issues, a class action is not the superior method for resolving the claims presented, as is also required by Rule 23(b)(3).

### III. CONCLUSION

A district court is required to conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class. Having conducted that rigorous analysis, and for the foregoing reasons, it is **ORDERED AND ADJUDGED** that Plaintiff's Motion for Class Certification [D.E. 58] is **DENIED.** The parties shall file a supplemental joint scheduling report proposing dates for trial and pretrial deadlines within ten (10) days of the date of this Order.

### *ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION AND MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT*

█ This cause came before the Court on Plaintiff's Motion for Reconsideration [D.E.

94] and Motion for Leave to File Second Amended Complaint [D.E. 96], filed on January 9, 2007. The Court has carefully reviewed Plaintiff's written submissions, and has not waited for receipt of Defendant's opposition.[1]

By Scheduling Order dated January 24, 2006, the parties were given a deadline of April 24, 2006 within which to amend their pleadings, and Plaintiff timely filed his motion seeking leave to file his first amended complaint on April 20, 2006. That motion was granted on June 29, 2006. The other pertinent dates contained in the January 24, 2006 Scheduling Order pertained to class certification discovery and the briefing on the motion for class certification discovery, which was to close on July 24, 2006. After extensive briefing, oral argument, and the filing of supplemental authorities, on December 22, 2006 the Court entered its Order Denying Motion for Class Certification Discovery, and required the parties, within ten days of the date of that Order, to file a supplemental joint scheduling report proposing dates for trial and pretrial deadlines.

Rather than comply, or seek an extension of time within which to do so, Plaintiff now seeks "reconsideration" of the denial of class certification, and submits his corresponding request to amend his pleading to address some of the deficiencies noted by the Court in the Order Denying Class Certification. The Motion for Leave to Amend does not address the failure of the Plaintiff to timely amend his pleading, in compliance with the January 24, 2006 Order. The Motion for Reconsideration hinges, of course, on permission being granted to Plaintiff to re-plead his claims. As to the Motion for Leave to Amend, under the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). The Supreme Court has emphasized that leave to amend must be granted absent a specific, significant reason for denial:

---

1. The Motion for Leave to File Second Amended Complaint acknowledges that Defendant has not

agreed to the relief requested.

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be freely given.

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (internal quotations omitted).

However, because the proposed Second Amended Complaint is sought to be filed after the deadline set by the Court's Scheduling Order, the Court must also evaluate the Motion under Rule 16(b). District courts are required to "enter a scheduling order that limits the time to ... join other parties and to amend the pleadings...." Fed.R.Civ.P. 16(b). Such orders "control the subsequent course of the action unless modified by a subsequent order," Fed.R.Civ.P. 16(e), and may be modified only "upon a showing of good cause." Fed.R.Civ.P. 16(b).

Here, the problems with the claims, as plead by Plaintiff, were made apparent as a result of the class certification briefing, and were addressed at oral argument, months ago. Not only is leave to amend not warranted under Rule 15(a) because of undue delay, but Plaintiff's present request to amend a second time contains no showing of good cause to extend the April 24, 2006 cutoff date for the amendment of pleadings.

■ Because the Motion for Reconsideration is based on an insufficient and inadequate Motion for Leave to Amend, it similarly fails. Moreover, "[t]he purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Z.K. Marine, Inc. v. M/V Archigetis,* 808 F.Supp. 1561, 1563 (S.D.Fla.1992) (citing *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985)). Motions for reconsideration are appropriate where, for example, the Court has patently misunderstood a party, where there is an intervening change in controlling law or the facts of a case, or where there is manifest injustice. *See id.; Compagnoni v. United States,* No. 94–813–Civ, 1997 WL 416482, at *2 (S.D.Fla. May 13, 1997).

■ In order to demonstrate clear error, the party must do more than simply restate his previous arguments, and any arguments the party failed to raise in the earlier motion will be deemed waived. *See McCoy v. Macon Water Authority,* 966 F.Supp. 1209, 1222 (S.D.Ga.1997). This is because

[a] motion for reconsideration should not be used as a "vehicle to present authorities available at the time of the first decision or to reiterate arguments previously made." [I]t is an improper use of the motion to reconsider to ask the Court to rethink what the Court ... already thought through—rightly or wrongly.... The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.... Such problems rarely arise and the motion to reconsider should be equally rare.

*Compagnoni,* 1997 WL 416482 at *2. Plaintiff has failed to satisfy this burden and accordingly, the Court will not reconsider the carefully thought-out issues addressed in the Order Denying Class Certification.

In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Reconsideration [D.E. 94] and Second Motion for Leave to File Second Amended Complaint [D.E. 96], filed on January 9, 2007, are **DENIED.** The parties' joint scheduling report, previously ordered, is to be filed by no later than January 16, 2007.