**William S. MONTGOMERY, Jr., individually and on behalf of all others similarly situated, Plaintiff,**

v.

**The NEW PIPER AIRCRAFT, INC. and Textron, Inc. d/b/a Textron Lycoming, Defendants.**

**No. 00–14284–CIV.**

United States District Court, S.D. Florida.

June 26, 2002.

---

Michael J. Pucillo, Robert Scott Palmer, Manuel Juan Dominguez, Berman DeValerio Pease Tabacco, Burt & Pucillo, West Palm Beach, FL, Fred Misko, Jr., Charles E. Ames, Dallas, TX, Philip L. Valente, Jr., Silber & Valente, West Palm Beach, FL, James L. Branton, Branton & Hall, San Antonio, TX, Samuel Issacharoff, New York City, for plaintiff.

Elizabeth Lim, Dombroff & Gilmore, Miami, FL, A. Daniel Ullman, Dombroff & Gilmore, P.C., Washington, DC, Benjamine Reid, Carlton Fields, Miami, FL, for defendants.

### ORDER ON REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE

ROETTGER, District Judge.

**THIS CAUSE** is before the court upon the Report and Recommendation prepared by United States Magistrate Judge Frank J. Lynch, who recommends denying Plaintiff's motion for class certification. Upon independent *de novo* review of the report and recommendation, the objections filed by Plaintiff, and the entire record herein, the findings and recommendation of Magistrate Judge Lynch are approved and adopted. Therefore, it is

**ORDERED AND ADJUDGED** that Plaintiff's motion for class certification is hereby **DENIED.**

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff's motion to reconsider various orders of Magistrate Lynch is **DENIED.**

### REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO PERMIT MAINTENANCE OF A CLASS ACTION (DE # 19)

LYNCH, United States Magistrate Judge.

**THIS CAUSE** having come on to be heard upon the Plaintiff's aforementioned motion and this Court having reviewed the motion, the responses, the pertinent documents submitted by the parties in respect to their relative positions and having held a hearing on October 26, 2001, at which time arguments of counsel were received, this Court recommends to the District Court as follows.

### FINDINGS OF FACT

1. Plaintiff's Amended Complaint alleges defects in a Malibu Mirage single-engine aircraft manufactured by Defendant New Piper and equipped with the TIO–540–AE2A engine manufactured by Defendant Textron.

2. New Piper is a successor in interest to Old Piper, and has its principal place of business in Vero Beach, Florida. Textron has its principal place of business in Williamsport, Pennsylvania.

3. The Plaintiff alleges that New Piper and Textron violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") by stating in marketing materials that the AE2A engine will operate 2000 service hours before requiring an overhaul. He seeks recovery of economic damages based on the contention that the Malibu Mirage in which he purchased an interest has diminished in value.

4. The Plaintiff seeks to certify the following nationwide class under FDUTPA:

"All current and former owners of Malibu Mirage Airplanes equipped with Lycoming TIO–540–AE2A engines during the period from 1987 through the present; excluding, however, any claims against The New Piper Aircraft Inc., for any product manufactured or sold by Piper Aircraft Corporation prior to July 11, 1995. Also excluded from the class are the defendants, each of their parents, subsidiaries, authorized distributors and affiliates, any person controlled by any excluded person, and the legal representatives, heirs, successors and assigns of any excluded person."

5. Since 1987, Textron has sold engines for over 500 Mirage aircraft, 310 of which were manufactured by New Piper. Textron manufactures and tests its engines at its plant in Williamsport, Pennsylvania. Bearings for the engines are manufactured by a separate company, KS Bearings, in Indiana and Germany. The finished engines are shipped to Florida where they are installed into the Mirage aircraft.

6. New Piper distributes Mirages to independent distributors on an as-ordered basis in 44 states and the District of Columbia.

7. At various times, Textron provided Mirage owners with documents called "Service Instructions." On January 10, 1997, Textron issued, and on November 4, 1998, November 5, 1999 and May 16, 2000, Textron reissued, Service Instruction 1009 which "recommended time between overhaul periods" (also known as "TBO")—including a 2000 hour recommended TBO for the TIO–540–AE engine. The Plaintiff contends that this statement is a material misrepresentation which violates FDUTPA.

8. Service Instruction 1009 goes on to advise that: A) "Service experience, variations in operating conditions, and frequency of operation are some of the factors taken into consideration when a TBO is established." B) "[B]ecause of variations in the manner in which engines are operated and maintained, Textron Lycoming can give no assurance that any individual operator will achieve the recommended TBO." C) "Reliability and average service life cannot be predicted when an engine has undergone any modifications not approved by Textron Lycoming." The TBOs shown in the table are recommendations for engines as manufactured, without considering any modifications that may alter the life of the engine.

9. On May 31, 2000, New Piper issued Vendor Service Publication 124, which attached Textron Special Advisory No. 56–500 notifying the Mirage community that it had received a number of reports regarding abnormal crankshaft bearing wear on a small percentage of "low time" AE2A engines (less than 500 hours). It thus required owners and pilots of Mirages shipped from the factory between August 25, 1995 and July 3, 1999, and with less than 500 hours service time, to monitor filters for metal in the oil at 50 hour intervals. It stated that, because abnormal crankshaft bearing wear was not a flight safety issue, main bearing replacement was "at owner's discretion." For engines within Textron's warranty period, Textron offered to install new main bearings at its own expense. For engines outside the warranty period, Textron offered to install new main

bearings with Textron contributing shipping expenses and half the cost of repair.

10. On August 31, 2000, Textron issued Special Advisory No. 59–800 advising the Mirage community that two instances of connecting rod bearing failures had occurred on relatively low time AE2A engines which resulted in a disintegration of the bearing. Textron instituted a mandatory replacement program to equip the engines with connecting rod bearings with increased durability. The replacement program began on October 2, 2000 and applied to all AE2A model engines shipped from the factory after August 25, 1995.

11. Plaintiff Montgomery is a citizen and resident of the State of Texas. He has never been a resident of the State of Florida. The record does not reflect that Montgomery had any relevant contact with Florida during the class period.

12. In May 1998, Montgomery purchased a one-third interest in a Texas limited liability company whose sole asset was Malibu Mirage N9285W ("the WOWAM aircraft") and which was purchased privately from an independent distributor, Cutter Aviation, in Phoenix, Arizona. On January 2, 2000, the WOWAM aircraft was damaged in an off-airport, gear-up landing and the Plaintiff makes no claims regarding the WOWAM aircraft in this lawsuit.

13. In April of 2000, the Plaintiff purchased a 50 percent interest in SKB Aviation, a Texas partnership, which was a 50 percent interest holder in another corporation, J.M.S. Aviation, LLC, which was the record owner of Malibu Mirage No. N960MA ("Mike Alpha"). This is the aircraft which is the subject of Plaintiff's individual claim herein. Therefore, at the time this lawsuit was filed, Montgomery does not appear to have been the record owner of the Mike Alpha aircraft.

14. The Plaintiff's purchase of Mike Alpha was transacted entirely in the State of Texas where the aircraft has been continually maintained.

15. Subsequent to filing the Complaint herein, on or about April 27, 2001, Plaintiff purchased a majority interest in the Mike Alpha from J.M.S. Aviation. At the same

time, Plaintiff purchased the claims held by J.M.S. Aviation against New Piper and Textron.

### CONCLUSIONS OF LAW

16. The Defendants argue that Plaintiff lacks standing because his claims properly arise under Texas law. As an initial matter, the Court must decide whether the choice of law question is ripe for adjudication. The Court concludes that it is. *See Rutstein v. Avis Rent–A–Car Systems, Inc.*, 211 F.3d 1228, 1234 (11th Cir.2000).

17. This Court, exercising diversity jurisdiction, is bound by the Erie doctrine to apply the choice of law methodology of the State of Florida which has adopted the "significant relationships test" for causes of action that arise out of a tort. *See Emmart v. Piper Aircraft Corporation*, 659 F.Supp. 843 (S.D.Fla.1987). This Court believes that test to be the most appropriate for determining choice of law issues pursuant to a deceptive trade practice statutory claim. Under the significant relationships test, all substantive issues will be determined in accordance with the law of the state having the most significant relationship to the occurrence and the parties. The place of injury still determines which state's law applies, unless some other state has a more significant relationship to the issue. *See Emmart, supra.*

18. Here, the Plaintiff's alleged injury occurred in Texas. He is a citizen of that state and purchased all his interests in the Mike Alpha aircraft in Texas. He keeps the aircraft in Texas. Therefore, if he suffered any diminution in value of the aircraft, it occurred in Texas.

19. Florida's interest in Plaintiff's claim is relatively weak. Although the Plaintiff focuses on New Piper's alleged wrongful conduct in Florida, the defects purportedly causing Mirages not to reach 2000 hours before an overhaul are related to faulty connecting rod and crankshaft bearings manufactured either in Germany or Indiana and installed in Textron engines in Pennsylvania. The engines were then installed in New Piper aircraft in the State of Florida.

20. This Court has previously addressed very similar arguments. In *Peoples Bank and Trust Co. v. Piper Aircraft Corporation*, 598 F.Supp. 377 (S.D.Fla.1984), Old Piper was sued by an aircraft owner's estate after his Aerostar plane crashed in Ohio. Piper argued that Ohio law should apply because the owner had lived in Ohio, purchased and maintained his aircraft in Ohio where the injury occurred. The plaintiff in that case argued that Florida law should apply because Piper was headquartered in this state at least part of the time, negligently developed and sold the defective parts in Florida, and refused to make improvements to the airplane after learning of its dangerous defects in Florida.

21. Judge Gonzalez ruled that Ohio law should apply. The injury in Ohio was not fortuitous. The fact that the owner lived in Ohio, kept his plane there and suffered fatal injuries there "militate strongly in favor of applying Ohio law." Furthermore, Ohio had a strong interest in the nature and extent of the owner's compensatory relief. Florida had a comparatively low interest in seeing that the owner's beneficiaries received their proper distribution of a compensatory award. Even though some of the alleged wrongdoing occurred in Florida, the relationship between the owner and Piper was centered in Ohio.

22. This Court's decision in *Emmart* involved an allegedly defective engine component that caused injury. Old Piper and Teledyne were sued by three estates of Indiana residents who were killed in a crash which occurred in Indiana. Judge Spellman agreed with the defendants' argument that Indiana law should apply. The owners were residents of Indiana and the aircraft was kept in Indiana.

23. Judge Spellman found that Florida's interest was relatively small since the aircraft system which failed was manufactured by Teledyne in Michigan or Alabama, not Florida. Although, as here, the installation of the engine into the Piper aircraft was performed in Florida, the design, development and testing of it took place elsewhere.

24. The Plaintiff herein brings his action under one Florida statute—FDUTPA. However, his individual claim is more appro-

priately brought under the analogous Texas deceptive trade practices act under the undisputed facts in this case. As ·a result, he lacks standing to bring his claim.

25. Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. In order to properly maintain a class action, Plaintiff must first demonstrate that: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999 (11th Cir.1997).

26. The Plaintiff seeks certification under Rule 23(b)(3). Therefore, this Court must also determine whether questions of law or fact common to the class predominate over questions affecting only individual class members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

27. The Plaintiff bears the burden of establishing that each and every one of the Rule 23 requirements are satisfied. *Heaven v. Trust Company Bank*, 118 F.3d 735 (11th Cir.1997). It is insufficient for the Plaintiff to simply rely upon the allegations of the Amended Complaint alleging that Florida law applies to all class members' claims.

28. Further, this is not the time for determining the merits of the lawsuit. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). This Court must analyze the facts alleged by the Plaintiff and determine if they are legally sufficient to permit class certification. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).

29. The Defendants do not challenge whether the Plaintiff has satisfied the numerosity requirement.

30. The Defendants stipulate that there are some common issues in this litigation. Therefore, the Court concludes that this requirement is satisfied.

31. The Rule 23(a)(3) typicality requirement focuses on whether the Plaintiff's claims have the same characteristics of the class at large. The Court concludes that the Plaintiff has failed to satisfy the Rule 23(a)(3) typicality requirement for two reasons.

32. First, Montgomery was not the record owner of the Mike Alpha aircraft. Rather, he was a partner in a limited liability company that itself was a shareholder in the company that was the airplane's record owner. Second, although Montgomery claims to have cured this defect by accepting an assignment of the claims held by J.M.S., the record owner of Mike Alpha at the time this matter was filed, this assignment itself raises a defense unique to Montgomery that suggests his claim is not typical of other putative class members. *See Hoechst Celanese Corporation v. Fry*, 753 So.2d 626 (Fla. 5th DCA 2000) (named plaintiff receiving claim by assignment failed to satisfy typicality requirement).

33. Rule 23(a)(4) requires that the named plaintiff fairly and adequately protect the interests of class members. "It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent." *Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir.2000).

34. The Defendants contend that intraclass conflicts between current owners and former owners of Mirages preclude certification because class members who were sellers during the class period are in irreconcilable conflict with putative class members who were buyers during the class period. The Plaintiff responds that this is an "imagined conflict" because all class members seek the same damages which are diminished value of the aircraft.

35. The Court agrees with the Defendants. Former Mirage owners who sold their aircraft during the class period will have to prove at trial that they received a depressed price for the aircraft in order to assert injury and recover damages. At the same time, owners (and former owners) who purchased their aircraft during the class period will have to prove that they paid full

price in order to claim that the value of their plane declined during their period of ownership, thereby entitling them to damages. Thus, the claims of sellers and buyers are inherently antagonistic. These individual claims will necessarily vary based on the terms of each sale between private parties. *See Telecomm Technical Services, Inc. v. Siemens Rolm Communications, Inc.,* 172 F.R.D. 532 (N.D.Ga.1997); *Oce Printing Systems USA, Inc. v. Mailers Data Services, Inc.,* 760 So.2d 1037 (Fla. 2d DCA 2000).

■ 36. The Plaintiff relies on the Florida court's *Renaissance Cruises, Inc. v. Glassman,* 738 So.2d 436 (Fla. 4th DCA 1999) decision in support of his argument that FDUTPA can apply not only to his claim but also the nationwide claims of all putative class members, irrespective of where they lived and suffered alleged diminution in value injury. This Court concludes, however, that *Renaissance* is distinguishable from the case at bar. *Renaissance* involved a cruise line's alleged deceptive practices in collecting excessive port charges. Passengers made payment for their cruises to Renaissance in Broward County. The Court found that common injury occurred in Florida making Florida law appropriate for resolving putative class members' claims.

37. In this case, there is no evidence in the record of any putative class members having suffered any alleged injury in Florida. Accordingly, the putative class members' contacts with Florida in this case are much more attenuated than they were in *Renaissance.*

38. Another recent Florida Fourth District Court of Appeals decision is instructive in its treatment of *Renaissance.* In *Stone v. Compuserve Interactive Services, Inc.,* 804 So.2d 383 (Fla. 4th DCA 2001), the court affirmed the trial court's ruling rejecting certification of a nationwide breach of contract claim against Compuserve because individual legal issues predominated over common ones. The court said that "Florida has insufficient contacts with the purported class members of other states to justify the application of Florida's contract law to a nationwide class".

39. The court distinguished *Renaissance* by saying that, in that case, everyone did business with the cruise line in Florida, they made payment for the cruises in Broward County, Florida, and the tickets provided that Broward County would have jurisdiction over all disputes. Therefore, the parties reasonably expected that Florida law would apply to the transaction. By contrast, in *Stone,* the contracts were made all over the nation. *See also Oce Printing Systems, supra.*

40. The Florida Third District Court of Appeals in *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General,* 761 So.2d 1256 (Fla. 3d DCA 2000) declined to follow the Fourth District decision in *Renaissance.* The Third District held that FDUTPA could apply to persons residing outside the State of Florida "where the allegations ... reflect that the offending conduct occurred entirely within this state ...".

41. In the case before us now, it is undisputed that the alleged injuries did not take place "entirely within this state". Therefore, this Court finds no material differences in the opinions of the Florida District Courts of Appeal for the Second, Third and Fourth Districts as to the law applicable to the facts in this case.

42. The Fifth Circuit also reached this same conclusion on similar facts in *Spence v. Glock,* 227 F.3d 308 (5th Cir.2000). There, in a gun defect suit filed by handgun owners against the manufacturer, the court reversed the grant of certification because the district court merely assumed that Georgia law would apply to putative class claims. Therein the plaintiff alleged that the gun suffered from a design defect that caused it to discharge. In certifying a class, the district court had ruled that Georgia law applied to all class members' claims because (1) the guns were imported, assembled and tested for quality control in Georgia; (2) the defendant's U.S. subsidiary was incorporated and had its principal place of business in Georgia; and (3) defendant distributed its guns and received warranty cards there.

43. The Fifth Circuit reversed the decision of the district court finding that it had not given enough weight to the interests of the states in which injury occurred, that is, the states in which class members had pur-

chased their guns. The Fifth Circuit also found that the district court's ruling that Georgia was the place where the conduct causing the injury took place was "suspect". It held the wrongful conduct occurred in Austria where the gun was designed and its parts manufactured, not Georgia where the guns were assembled. Further, the appeals court held that the district court failed to compare Georgia's interest with the much stronger interests of all other states where proposed class members lived and purchased their guns.

44. In this case, the record reflects that airplane sales to putative class members were made all over the nation. Any injury by way of diminution of value must have occurred in these other states where sales took place. Moreover, Florida's interest is not particularly strong given that the bearings, the failure of which allegedly gives rise to an engine defect and an inability of the aircraft to reach 2000 hours TBO, were manufactured in Indiana and Germany and installed in Textron engines in Pennsylvania. No putative class member who purchased their aircraft outside this state could reasonably have expected Florida law to apply to those out of state transactions. Therefore, under Florida's choice of law analysis, the law of the State of Florida should not apply to the claims of each class member.

45. The Commerce Clause to the United States Constitution precludes the application of FDUTPA to each and every class member's claim. The Supreme Court recognized in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) that the Commerce Clause prevents a state, through its courts, from "legislating" beyond its borders. In support of this argument, the Defendants cite the Supreme Court's holding in *Healy v. Beer Institute*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) that "the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside the State's borders, whether or not the commerce has effects within the state."

46. Thus far, there is no record evidence that any particular putative class member purchased an airplane in Florida commerce

and suffered injury in Florida commerce. Montgomery argues that putative class members' purchases throughout the nation become Florida commerce by virtue of the fact that New Piper is located in Florida and some of the conduct alleged to be wrongful occurred in this state. The Court disagrees. As Florida's Second District Court of Appeal held in analyzing the scope of another Florida statute: "It is the effect on trade that must occur in Florida, not the actions giving rise to the effect on trade". *See Oce Printing Systems, supra.*

47. In *Renaissance*, for example, even though the majority of class members were out-of-state residents, the commerce implicated by their claims was clearly instate commerce. As the Court has already discussed, in *Renaissance*, passengers' payment for their cruises "ultimately was made to appellant in Broward County" and "common injury occurred in Florida". Since the injury to each class member necessarily involved Florida commerce, not the commerce of their home states, the *Renaissance* decision is inapposite. The same is true with respect to *Latman v. Costa Cruise Lines, N.V.*, 758 So.2d 699 (Fla. 3d DCA 2000), which involved substantially the same claims as in *Renaissance*. There, the court adopted the *Renaissance* analysis and added that the passenger tickets specified Florida as the forum for litigation. In sum, the Court concludes that the commerce clause precludes FDUTPA from applying to all putative class members' claims.

48. In *Phillips Petroleum Company v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), the United States Supreme Court held that if there is a material conflict between the law of the forum state and other states implicated in a class action, a court may apply a single state's law to an entire class only when the forum state has "significant contact or significant aggregation of contacts to the claims asserted by each member of the Plaintiff class". Additionally, each putative class member's expectation of what state law applies is an "important element" in determining the constitutionality of applying a single state's law.

49. The Court concludes that, under *Shutts,* the Due Process Clause of the Constitution prohibits application of FDUTPA to a nationwide class in this case. There are several material conflicts between FDUTPA and other states' consumer fraud acts. For the vast number of putative class members, Florida's only contacts with this litigation is that New Piper manufactures aircraft in Florida. These aircraft were then sold through New Piper distributors or through private transactions outside the State of Florida. *See Judge v. American Motors Corporation,* 908 F.2d 1565 (11th Cir.1990).

50. The Plaintiff argues that it is not a violation of due process to handle all claims under the laws of Florida, the home state of New Piper. In support of that argument he cites *Shutts,* characterizing the Court's holding as being that "it is constitutionally permissible to apply a single state's law to a nationwide class action, so long as that state has a 'significant aggregation of contacts,' and individual class members have a right to opt out". However, this Court reads the Supreme Court's opinion to hold that a state must have a significant contact or significant aggregation of contacts to the claims asserted by each member of the plaintiff class. The relevant transactions in this case giving rise to possible damages are the putative class members' transactions in purchasing airplanes. Some of which may not have taken place in Florida.

51. Finally, the Supreme Court already has rejected the Plaintiff's argument that application of the forum's law to out of state class members is appropriate despite innumerable choice of law difficulties because class members can simply opt out if they do not like the application of Florida law. In *Shutts,* the Supreme Court gave "little credence" to the idea that Kansas law should apply to all claims because the plaintiffs, by failing to opt out, evinced a desire to be bound by Kansas law.

52. Once the Court has determined that the deceptive trade practices laws of various states apply to individual putative class members' claims, it must now decide whether variations in those laws are sufficiently substantial to cause individual issues of law to predominate over supposed common issues. In addition, when a survey of the various deceptive trade practices laws is done, it becomes clear that a class action trial in this case would be wholly unmanageable. While some deceptive trade practices laws stem from common sources, they are not uniform. The result is a patchwork of rules and standards reflecting the diverse policy judgments of lawmakers in fifty states. *See BMW, supra.*

53. The Court further finds that individualized factual inquiries preclude class certification. The first question is whether the representations alleged to be actionable are subject to common proof or individualized proof. An action based substantially on oral rather than written communications is inappropriate for treatment as a class action. *Johnston v. HBO Film Management, Inc.,* 265 F.3d 178 (3d Cir.2001). The record evidence reflects that at least some potential Malibu Mirage purchasers received oral, non-uniform, individualized sales presentations from independent distributors, brokers and private sellers.

54. The next question is whether the Plaintiff can show by common proof that the alleged misrepresentations regarding the Mirage's ability to reach 2000 hours service time before overhaul actually caused injury to the individual putative class members. Even if this Court limits its consideration to the causation standard under FDUTPA, common fact questions still are outweighed by individual fact questions.

55. FDUTPA requires proof of causation. Fla.Stat. § 501.211(2); *see Hubbel v. Aetna Casualty & Surety Company,* 758 So.2d 94 (Fla.2000) (noting that the "obvious purpose of FDUTPA is to make consumers whole for losses caused by fraudulent consumer practices"). Therefore, in order to prove liability under FDUTPA, the Court must determine that (1) each putative class member was exposed to the Defendants' advertising and marketing materials alleged to constitute a deceptive trade practice and (2) if exposed, the advertising and marketing materials caused each putative class member damage. Such inquiries would result in a series of mini-trials for each putative class member on

the issue of causation, which strongly militates against a finding of predominance. *See Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours and Company, Inc.*, 1994 WL 1251231 (S.D.Fla.1994); *Neenan v. Carnival Corporation*, 199 F.R.D. 372 (S.D.Fla.2001).

56. As noted previously herein, putative class members purchased aircraft in at least forty-four states and the District of Columbia, from numerous dealers and from private sellers. Individualized inquiries will thus be necessary to explore whether any particular class member received an alleged misrepresentation from the Defendants and suffered any damage. No single set of operative facts determines liability.

57. The Plaintiff did not deal with any salesperson from New Piper or Lycoming in purchasing his Mike Alpha aircraft. There was no New Piper dealer nor distributor involved in his particular transactions. According to Plaintiff's expert, Mr. Hynes, whether any particular Mirage engine requires premature overhaul, and for what reason, can only be determined on a case-by-case basis. The Court finds that these individual issues of causation preclude predominance. *See also Rutstein, supra.*

58. Proof of damages is required for recovery under FDUTPA. *Eclipse Medical, Inc. v. American Hydro–Surgical Instruments, Inc.*, 1999 WL 181412 (S.D.Fla.1999). Under FDUTPA, recoverable damages are limited to the market value diminution caused by the deceptive trade practice. *Id.* Like causation, individual damage issues preclude predominance. *O'Brien v. J.I. Kislak Mortgage Corporation*, 934 F.Supp. 1348, (S.D.Fla.1996).

59. The Court is convinced that the individual damages inherent in this action preclude predominance on two levels, because, even for those putative class members who may have suffered some degree of injury, a case-by-case factual inquiry is necessary to determine the quantum of damages for each of those putative class members.

60. Calculating damages under FDUTPA requires an in-depth analysis of market value depletion due to the "deceptive" trade practice. Such an inquiry automatically invokes an aircraft-by-aircraft inquiry into (1) when and where *each* plane was purchased, (2) when the plane was sold (if applicable), and (3) the current market value of each plane. *See Eclipse Medical, supra.* Also, such an analysis would involve individual defenses concerning maintenance and other matters unique to each aircraft. Therefore, determining the amount of FDUTPA's mandatory damages inquiries for each class member would result in a series of mini-trials to ascertain whether each putative class member has, in fact, been damaged under the statute. The Court holds that such an undertaking precludes a finding of predominance.

61. For all the foregoing reasons, class certification should be denied, based on a lack of Rule 23(b)(3) predominance. Additionally, certification is not warranted because a class action is not the superior method of resolving Mirage owners' complaints. Case manageability difficulties militate against certification. The individual inquiries regarding causation and damages would be overwhelming and would require numerous mini-trials on both issues.

62. In addition, there is nothing to indicate that individual owners of these aircraft will be precluded from bringing separate legal actions if they so desired.

63. Based on all submissions made by the parties in respect to this motion, this Court concludes that maintaining a class action is inappropriate.

64. In deciding whether an evidentiary hearing was necessary, this Court considered the Plaintiff's Amended Complaint, the joint statement of stipulated facts, the Plaintiff's statement of disputed facts and the applicable case law. This Court held a hearing on this motion and permitted the parties to make oral argument in respect to their respective positions. This Court advised the parties that after reviewing the motion, responses, the Amended Complaint and other noted pleadings that if this Court believed an evidentiary hearing was necessary, it would set one by subsequent order. The Plaintiff requested an evidentiary hearing and the Defendants asserted that an evidentiary hearing was not necessary.

65. This Court does not believe an evidentiary hearing is necessary because the pleadings taken in the light most favorable to the Plaintiff do not sufficiently establish the legal requirements for maintaining a class action as referred to herein. This Court believes that the Plaintiff's Amended Complaint fails to even assert the minimum contacts with Florida to justify proceeding with a claim under FDUTPA. Additionally, this Court believes that the facts alleged by the Plaintiff support this Court's finding that individualized facts and claims predominate over class claims. There is not even a common source of sale nor a common source of material representation of warranty since there were admittedly mostly private sales of these aircraft between private individuals all across the United States.

66. The Amended Complaint alleges that putative class members have suffered excessive maintenance costs, increased operating costs, premature engine overhaul or replacement costs, excessive loss of use, costs of travel, loss of use of hanger time, loss of use of investment and loss of resale value. All of these claims are highly individualized claims subject to detailed individualized proof.

67. An evidentiary hearing would not have cured any of these legal deficiencies in the Plaintiff's case. *See Lewis v. Heckler,* 752 F.2d 555 (11th Cir.1985); *Hall v. Burger King Corp.,* 1992 WL 372354 (S.D.Fla.1992).

**ACCORDINGLY,** this Court recommends to the District Court that the Plaintiff's Motion To Permit Maintenance of a Class Action be **DENIED.**

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Norman C. Roettger, United States District Judge, assigned to try this case.