2009 OK 24

Braulio M. CUESTA and Eric L. Golden, individually and on behalf of all others similarly situated, Plaintiffs/Appellees,

v.

FORD MOTOR COMPANY and Williams Controls, Inc., Defendants/Appellants.

Nos. 104,480, 104,485.

Supreme Court of Oklahoma.

April 21, 2009.

Michael Burrage, Durant, OK, John E. Dowdell, William W. O'Connor, Tulsa, OK, Troy L. Greene, Houston, TX, and Mark A. Giugliano, Grant J. Harvey, Andrew L. Pickens, Houston, TX, for Plaintiffs/Appellees.

Vani Singhal, Mary Quinn Cooper, Andrew L. Richardson, Shelly J. Dalrymple, Tulsa, OK, and W.G. "Gil" Steidley, Charles D.

Neal, Jr., McAlester, OK, for Defendant/Appellant Ford Motor Company.

John J. Carwile, Gregory D. Nellis, Marthanda J. Beckworth, Tulsa, OK, and Kurt Stitcher, Chicago, IL, for Defendant/Appellant Williams Controls, Inc.

## *OPINION*

### WATT, J.:

¶1 This Court granted the petition for writ of certiorari of Braulio M. Cuesta and Eric L. Golden, (Plaintiffs) in their action against Ford Motor Company (Ford) and Williams Controls, Inc., (Williams) or (collectively, Defendants) to determine whether the trial court abused its discretion in certifying a class action under the facts presented. Upon review of the Oklahoma Court of Civil Appeals' (COCA) reversal of the trial court's order granting class action certification pursuant to 12 O.S.2001 2023,[1] we find the trial court did not abuse its discretion. The trial court's order of certification is affirmed in part, reversed in part and remanded for further proceedings. The opinion of the Court of Civil Appeals is vacated.

## II. PROCEDURAL HISTORY AND CONTENTIONS

¶2 Plaintiffs brought their claims against Defendants for design and/or manufacturing defects in the fixed, non-adjustable accelerator pedal, i.e., the "electronic throttle control", or "ETC", which is designed and manufactured by Williams and installed in certain trucks[2] manufactured by Ford.[3] They con-

---

1. Oklahoma's statute on class action certification is found at 12 O.S.2001 2023 which provides, in part:

   A. PREREQUISITES TO A CLASS ACTION. One or more members of a class may sue or be sued as representative parties on behalf of all only if:
   1. The class is so numerous that joinder of all members is impracticable;
   2. There are questions of law or fact common to the class;
   3. The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
   4. The representative parties will fairly and adequately protect the interests of the class.
   B. CLASS ACTIONS MAINTAINABLE. An action may be maintained as a class action if the prerequisites of subsection A of this section are satisfied and in addition:
   1. The prosecution of separate actions by or against individual members of the class would create a risk of:
      a. inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
      b. adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
   2. The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
   3. The court finds that the questions of law or fact common to the members of the class pre-

dominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:
      a. the interest of members of the class in individually controlling the prosecution or defense of separate actions,
      b. the extent and nature of any litigation concerning the controversy already commenced by or against members of the class,
      c. the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and
      d. the difficulties likely to be encountered in the management of a class action.
   C. DETERMINATION BY ORDER WHETHER CLASS ACTION TO BE MAINTAINED; NOTICE; JUDGMENT; ACTIONS CONDUCTED PARTIALLY AS CLASS ACTIONS.
      . . .
      4. When appropriate:
      a. an action may be brought or maintained as a class action with respect to particular issues, or
      b. a class may be divided into subclasses and each subclass treated as a class. The provisions of this section shall then be construed and applied accordingly.

2. Plaintiffs' first amended petition describes the vehicles involved as "Ford Motor Co. vehicles that contain a fixed, non-adjustable accelerator designed and manufactured by Williams Controls, Inc., including, but not limited to 2001.25, 2002, 2003 and 2003.25 Ford trucks and Excursions with diesel engines."

3. The trial court certified the following class:

   All entities and adult persons domiciled or residing in any of the fifty states of the Unit-

tend the pedals, which were modified twice, failed Ford's "overload" tests and engineering specifications. It is alleged that when forcible pressure is applied to the pedals that they cause the vehicles to shift to idle instead of accelerating and, therefore, are defective and unreasonably dangerous. Plaintiffs' theories of recovery include breach of express and implied warranties, negligence and strict products liability. However, we determine only whether class certification is appropriate to determine a breach of warranty theory under the facts presented.[4] On March 1, 2007, the trial court granted Plaintiffs' Motion for Class Certification. In its order, the court discussed some of the evidence, stating:

> [P]laintiffs have presented substantial, uncontroverted evidence that Ford made two design changes to all of the pedals in an effort to remedy the "going to idle" defect. First, Ford attempted to remedy the BA pedal design (as well as the next generation pedal) by adding a forked lever arm to all existing pedals manufactured by WCI [Williams] with the goal of making the pedals more robust. But when that design modification proved insufficient, Ford then implemented a second universal design change aimed at eliminating the design gap behind all of the pedals at issue, which Ford engineers believed caused the "going to idle" defect. Plaintiffs presented evidence, in the form of Ford's documents and testimony from a Ford engineer, that all of the subject accelerator pedals share an identical 2–3 millimeter gap behind the pedal bracket in their CAD (computer-aided design) drawings and also share the identical pedal bracket.

With this background, Plaintiffs claim that the following common questions of law and fact exist in this case: (1) whether the accelerator pedals at issue are defective; (2) whether the pedals are unreasonably dangerous; (3) whether the pedals reduce the value of the vehicles; and (4) whether the sale of the vehicles containing these pedals to members of the class constitutes a breach of any express or implied warranty by Defendants Ford and WCI?

Based on the facts noted above and the evidence adduced to date, this Court finds, as in *Hanlon*[5], that these questions of fact and law presented by Plaintiffs are common to the class as they stem from the allegedly defective accelerators manufactured by WCI that were installed in 2001.25, 2002, 2003 and 2003.25 Ford pickup trucks and Excursions with diesel engines. . . .

¶ 3 It has been alleged there are between 300,000 and 500,000 potential class members who have Ford trucks with the subject pedals, either the BA, the BB or the AC, satisfying the "numerosity" requirement for class certification. 12 O.S.2001 2023(A)(1). Additionally, the trial court agreed with the Plaintiffs' asserted common questions of fact and law and found the central issues common to all class members are whether the pedals are defective and unreasonably dangerous and whether they give rise to breaches of Ford's and Williams' express and implied warranties and legal duties. The trial court also held that if the claim arises from the same event or course of conduct, and gives rise to the same legal or remedial theory, factual differences will not preclude certification, citing

---

ed States of America or in the District of Columbia who purchased or who, according to motor vehicle registration records maintained by their respective states or districts of residence or domicile, can be identified as the current owner of at least one Ford truck or Ford Excursion, including, but not limited, to model years 2001.25, 2002, 2003, and 2003.25 which was marketed or manufactured by defendant Ford for sale in any of the fifty states of the United States of America or the District of Columbia, and which contains a non-adjustable, fixed electronic throttle control ("ETC") accelerator pedal manufactured by Williams Controls, Inc., excluding entities or persons having claims for

personal injuries, death or property damage, other than claims for diminution in the value of the trucks or Excursions.

4. Because the plaintiffs seek economic damages only for, *inter alia*, the defect in the pedal or the diminution in value of the vehicle, we need not determine whether they might also recover under theories requiring the demonstration of personal injury and/or damage to property other than the allegedly defective accelerator pedal, i.e., strict products liability and negligence. See ¶ 15 and footnote 14, *infra*.

5. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir.1998).

*Lobo Exploration Co. v. Amoco Production Co.*, 1999 OK CIV APP 112, 991 P.2d 1048, *cert. denied*, 529 U.S. 1124, 120 S.Ct. 1996, 146 L.Ed.2d 821 (2000).

¶4 Despite Defendants' allegation that factual variations[6] between the Plaintiffs' and potential class members' claims preclude class certification, the trial court held the "typicality" requirement, 12 O.S.2001 2023 (A)(3), was satisfied. The court held:

a. the class representatives' and members' claims are based on the same legal theories: breach of express and implied warranties; negligence and strict products liability;[7]

b. the claims arise from the same course of alleged conduct, i.e., Ford installed Williams' defective accelerator pedals which do not meet Ford's overload engineering specifications and which consequently fail and go to idle when forcefully depressed; and

c. they seek identical remedies which include the replacement cost of the defective pedal and/or the diminution in value of the vehicle caused by the defective accelerator.

¶5 In the appeal brought by Defendants, COCA reversed the certification order, finding that individual issues predominated over the common issues and that the class was unmanageable. It held in ¶1:

The trial court erred in its choice of law decision. On *de novo* review of that question of law, we find that the law of the place of purchase applies to the claims asserted in this case. As a result the nationwide class certified in this case is unmanageable because individual issues predominate over the common issues. We therefore find that the trial court abused its discretion in certifying this case as a class action proceeding. We remand for further proceedings in accordance with this opinion.

¶6 In support of their certiorari request, Plaintiffs alleged the following:

6. Defendants alleged the plaintiffs' claims are not typical because they replaced the pedals in their vehicles. The record reflects that only Plaintiff Cuesta has replaced the pedal in his truck.

7. See footnote 4, *supra*.

I. COCA's choice of law analysis directly contradicts and conflicts with this Court's ruling in *Ysbrand v. DaimlerChrysler Corp.*[8]

II. COCA's ruling that individualized damages issues predominate over common issues contradicts the law of this Court and many federal courts, requiring this Court's review.

III. The Court of Appeals' typicality analysis conflicts with this Court's established precedent in *Ysbrand v. Daimler-Chrysler*, *Burgess v. Farmers Ins. Co.*,[9] and *Black Hawk Oil Co. v. Exxon Corp.*[10]

IV. COCA's inquiry on the merits is contrary to United States Supreme Court precedent and this Court's decisions in *Burgess v. Farmers Ins. Co.* and *Black Hawk Oil Co. v. Exxon Corp.*

## STANDARD OF REVIEW

¶7 A trial court's order certifying a class action is reviewed for an abuse of discretion. *Ysbrand v. DaimlerChrysler Corp.*, 2003 OK 17, 81 P.3d 618, *citing Scoufos v. State Farm Fire & Cas. Co.*, 2001 OK 113, 41 P.3d 366. If the record does not show that the requisites for class action have been met, the trial court has abused its discretion. *Masquat v. DaimlerChrysler Corporation*, 2008 OK 67, ¶8, 195 P.3d 48, 52, *citing Harvell v. Goodyear Tire & Rubber Co.*, 2006 OK 24, ¶9, 164 P.3d 1028, 1032. However, we must affirm if no such abuse of discretion is shown. *Black Hawk Oil Company v. Exxon Corporation*, 1998 OK 70, ¶1, 969 P.2d 337, 342. Further, this Court reviews *de novo* whether the trial court applied the correct legal standard in granting certification and will reverse the order if a question of law was decided incorrectly. *Masquat v. DaimlerChrysler Corporation*, 2008 OK 67, ¶8, 195 P.3d at 52, *citing Scoufos*, 2001 OK 113, ¶1, 41 P.3d 366, 367.

8. 2003 OK 17, 81 P.3d 618.

9. 2006 OK 66, 151 P.3d 92.

10. 1998 OK 70, 969 P.2d 337.

### CHOICE OF LAW ANALYSIS

¶ 8 As stated above, Plaintiffs contend COCA completely ignored this Court's decision in *Ysbrand v. DaimlerChrysler Corp.* by focusing on the place of delivery of the trucks, rather than Ford's or Williams' principal places of business, Michigan and Florida, respectively.[11] They argue that *Ysbrand* requires the law of the state or states with the "most significant relationship"[12] to the dispute to be applied in an automobile breach of warranty case.

¶ 9 In *Ysbrand,* the plaintiffs brought a lawsuit against DaimlerChrysler Corp., the manufacturer of minivans equipped with allegedly defective front passenger seat air bags. The trial court certified a class action as to claims for breach of warranty, fraud and deceit. This Court upheld the certification order as to the breach of warranty claims only. In considering the appropriate choice of law, we acknowledged the "most significant relationship test" applies to breach of warranty claims in Oklahoma. We relied on the *Restatement (Second) of Conflict of Laws,* § 191 (1971), Contracts to Sell Interests in Chattel, as specifically limited by the scope of comment (f). It provides:

The validity of a contract for the sale of an interest in a chattel and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

. . .

f. *When local law of state of delivery will not be applied.* On occasion, a state which is not the place of delivery will nevertheless, with respect to the particular issue, be the state of most significant relationship to the transaction, the parties and the chattel and hence the state of the applicable law ... There will also be occasions when the local law of some state other than that of delivery should be applied in any event because of the **intensity of the interest of that state** in the determination of the particular issue .... [emphasis added].

¶ 10 Under the guidance of § 191, comment (f), we held in *Ysbrand:*

[T]he particular dispute in this matter presents such an occasion in which 'the local law of some state **other than that of delivery** should be applied in any event because of the intensity of the interest of that state in the determination of the particular issue.' [emphasis added].

*Ysbrand,* 2003 OK 17, ¶ 13, 81 P.3d 618, 625.

¶ 11 We held Michigan's interest was more significant than the UCC laws of the individual states of contracting and concluded it was the state with the "most significant relationship" to the transactions and the parties:

The *Restatement's* section 188(2) [Validity of Contracts and Rights Created Thereby] contacts of the place of contracting, the place of negotiation and performance, and the location of the subject matter are of diminished significance to the sales of the minivans. The UCC warranties are not something which is negotiated in the purchase of a new car. Thus, the relative interest of each buyer's home state in applying its version of the UCC is more or less equal. By contrast, Michigan's interest in having its regulatory scheme applied to the conduct of a Michigan manufacturer

---

**11.** It is alleged that Florida is the state of Williams' principal place of business and Oregon is the state where its headquarters is located.

**12.** In *Ysbrand,* we noted previous cases which had applied the "most significant relationship test" for torts and for actions that fall under Article 2 of the Uniform Commercial Code, i.e., *Bohannan v. Allstate Ins. Co.,* 1991 OK 64, 820 P.2d 787, which relied on *Collins Radio Co. v. Bell,* 1980 OK CIV APP 57, 623 P.2d 1039. This

test "determines which state's law is most directly connected to the parties and the transaction." *Ysbrand,* 2003 OK 17, ¶ 12, 81 P.3d at 625. It examines the "intensity of the interest" of a state, other than the state of delivery, to determine the state with the "most significant relationship to the transaction, the parties and the chattel and hence the state of the applicable law." *Ysbrand,* 2003 OK 17, ¶ 13, 81 P.3d at 625.

is most significant. Michigan is where the decisions concerning the design, manufacture, and distribution of the minivans were made. Michigan is the only state where conduct relevant to all class members occurred. The principal place of Daimler-Chrysler's business is the most important contact with respect to the UCC warranty claims.

The selection of Michigan law furthers the relevant factors stated in section 6 of the *Restatement*. The needs of the interstate system and the basic policies of predictability and uniformity of result require that the issue of product defect be determined in one forum with one result rather than in 51 jurisdictions with the very real possibility of conflicting decisions. While the interest of each home state in applying its local law is significant, **Michigan's interest in the conduct of its manufacturer, and thus its connection to the warranty issues, is greater. Michigan law applies**....

*Ysbrand,* 2003 OK 17, ¶¶ 15, 16, 81 P.3d 618, 625–626 [emphasis added].

¶ 12 Plaintiffs contend the trial court's analysis in favor of Michigan was correct and should be applied. In the alternative, they argue for the application of Michigan and Florida law as the states of the defendants' respective principal places of business. Because decisions were made by each company as manufacturers in those states, Plaintiffs assert those states have a greater "intensity of interest," and therefore, the "most significant relationship" to the parties and their UCC breach of warranty claims. Plaintiffs also argue that COCA misconstrued *Ysbrand* when it held that if the conduct relevant to all class members occurred in more than one state under a "most significant relationship"

analysis, then the laws of all states of delivery apply automatically.

¶ 13 In applying *Ysbrand,* the trial court in the present case considered the number of significant contacts both companies have to Michigan and held that Michigan law should apply to both Ford and Williams. Williams' contacts with Michigan are numerous and significant, as noted by the trial court. It contracted with Ford in Michigan and produced the pedals as a supplier for trucks manufactured by Ford. Although certain activities may have occurred in different states, the "engineering specifications" from which Williams was to design the pedals emanated from Ford's engineers in Michigan. This is in line with *Ysbrand,* supra, wherein we found Michigan's interest in the conduct of DaimlerChrysler Corp., as manufacturer of the minivans, "and thus its connection to the warranty issues," was greater than the place of delivery for determining the Plaintiffs' claims for defective air bags. *Id.,* at 626.

¶ 14 Moreover, both Ford and Williams appeared to understand that Ford's requirements and specifications would govern the business relationship and that Ford directed the activities between the parties.[13] In the alternative, the trial court ruled the application of Michigan, Florida and Oregon law was feasible because the laws were similar in the areas of negligence, strict products liability and breach of warranty in those three states. However, we have examined the tort laws of these states and have determined that Plaintiffs' request for only economic damages makes it unnecessary to consider Plaintiffs' tort theories of recovery in our choice of law analysis for class certification.[14]

**13.** For example, when it was discovered that two different BA pedals failed in the Ford truck of a Ford employee, in Michigan, by going to idle with an aggressive "wide open throttle," Ford engineer Greg West, located in Michigan, sent the pedals to Williams for testing. He testified he would want to know if there were more pedals susceptible to not meeting the "overload" requirements set forth in Ford's engineering specifications. He also testified he contacted engineer Don Silanpaa, formerly with Ford but who was at the time working with Williams, to ask him to provide him with all of the data

relating to the production validation (PV) testing done in the summer of 2000 "to see if there was any indication of why the pedals weren't passing a portion of the overload test." He also asked Williams to provide him with all of the data relating to the PV overload tests performed in 2000. He stated at his deposition he did not recall seeing the actual data that showed that every one of the units tested in 2000 had failed.

**14.** See note 4, *supra.* Negligence and products liability claims require proof of personal injury and/or damage to the property other than the

¶ 15 For purposes of Plaintiffs' breach of warranty claims, we find that the law of Michigan, the state of Ford's principal place of business as manufacturer which controlled the specifications, requirements and testing for the pedals, has a greater "intensity of interest" than any other state involved. Its law should be applied.[15] Although Defendants and COCA would characterize this rule as an "exception" to the general rule of § 191 of the Restatement, it is the law in Oklahoma as to UCC breach of warranty claims brought against manufacturers.

¶ 16 Moreover, in light of the nature and extent of Williams' contacts with Ford in Michigan, we find Michigan has a significant "aggregation of contacts" such that the application of Michigan law to the breach of warranty claims is "neither arbitrary nor fundamentally unfair" and thus, constitutional. See *Ysbrand*, 2003 OK 17, ¶ 16, 81 P.3d at 626, citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

## DAMAGES AND PREDOMINANCE

■ ¶ 17 The trial court held Plaintiffs and class members seek identical remedies which include the replacement cost of a defective pedal and/or the diminution in value of the vehicle caused by the defective pedal. COCA held that individualized issues of damages predominate over common issues, including whether owners who have not experienced the defect would want a replacement pedal, an uncertainty making the class unmanageable.

¶ 18 Plaintiffs argue that the alleged "different types of damages sought" amount to no more than differences in the **amount** of monetary damages.

■ ¶ 19 While Ford acknowledges the rule that predominance is not defeated by questions of individual damages as long as *liability* is still subject to common proof, citing *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir.2008) [emphasis added],[16] it argues Plaintiffs must provide some means of determining that each member of the class was in fact injured. Williams argues there are also conflicts among class members on the issue of damages because the defined class includes both current and former owners.[17]  Okla-

damaged property itself. *Henry v. The Dow Chemical Co.*, 473 Mich. 63, 701 N.W.2d 684 (2005); *Sherman v. Sea Ray Boats*, 251 Mich. App. 41, 649 N.W.2d 783 (2002); *McCathern v. Toyota Motor Corp.*, 332 Or. 59, 23 P.3d 320 (2001). Economic damages are not recoverable for these tort claims without such proof. *Loosli v. City of Salem*, 345 Or. 303, 193 P.3d 623 (2008); *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 486 N.W.2d 612 (1992). Breach of warranty claims, on the other hand, allow recovery of economic damages, such as the cost of replacement of the defective pedal and/or diminution in value of the truck. See *Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 538 N.W.2d 325 (1995); *Prentis v. Yale Manufacturing Co.*, 421 Mich. 670, 365 N.W.2d 176 (1985); *Indemnity Insurance v. American Aviation, Inc.*, 891 So.2d 532 (Fla.2004). Oklahoma law similarly provides that no action lies in manufacturer's products liability for purely economic injury to the product itself. See *Waggoner v. Town & Country Mobile Homes, Inc.*, 1990 OK 139, 808 P.2d 649, citing *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) and *Moss v. Polyco*, 1974 OK 53, 522 P.2d 622, 626. See also *Dutsch v. Sea Ray Boats, Inc.*, 1992 OK 155, 845 P.2d 187.

15. Moreover, the UCC warranty laws in Michigan are similar to those of Oregon and Florida.

16. Relying on the UCC, § 2–314, comment 15 (2004), Ford contends that in a breach of warranty action, there must be proof that the warranty existed, the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained.

17. In their reply briefs on appeal, Plaintiffs took issue with the argument that the class definition includes former truck owners. They distinguished a case cited by Defendants, *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221 (S.D.Fla.2002), in which the class definition included "former owners" and "current owners." The class definition in the present case does not specifically include "former owners," but those "who purchased or who ... can be identified as the current owner...." While an argument could be made for extending the class definition to former owners, an equally valid argument can be made that it includes current record owners who obtained their vehicles as purchaser or by gift or assignment. "Owner" under the Oklahoma Vehicle License and Registration Act, 47 O.S. 1102 (23) is defined as "any person owning, operating or possessing any vehicle herein defined." Moreover, because Plaintiffs have taken the position that the class includes only current owners of the specified truck models, they and the Defendants are bound by it.

homa law holds that "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory."[18] In the present case, the trial court's holding on common fact questions follows Oklahoma precedent. Moreover, we affirm the trial court's certification order only as to Plaintiffs' breach of warranty claims for which economic damages, such as replacement costs, are appropriate. The trial court can use subclasses, if necessary, to distinguish between different types of economic damages, e.g., replacement costs, diminution in value, or the cost of a loaner vehicle, or different models of the allegedly defective pedals, i.e., the BA, BB or AC. See 12 O.S.2001 2023(c)(4).

## TYPICALITY AND COCA'S CONSIDERATION OF THE MERITS

¶ 20 Finally, Plaintiffs contend COCA's typicality analysis conflicts with this Court's well-established precedent in *Ysbrand*,[19] *Burgess,* and *Black Hawk Oil Co. v. Exxon Corp.* They also contend that COCA erred in its consideration of the merits, contrary to U.S. Supreme Court precedent and this Court's decisions in *Burgess* and *Black Hawk Oil Co. v. Exxon Corp.* We agree.

¶ 21 Plaintiffs argue that COCA based its decision as to typicality on the potential differences among class representatives and members' experiences, but expressly disregarded the trial court's findings which include: (1) that the claims are based on the same legal theories, (2) that the claims arise from the same course of conduct by Defendants (Ford installed defective pedals, manufactured by Williams, which do not meet Ford's own engineering specifications); and (3) that the same remedies are being sought (cost of replacing the pedal and/or diminution in value).

¶ 22 Ford responds that Plaintiffs must do more than merely "allege" the claims are all based on the "same legal theories" because they "arise from the same course of Defendant's conduct" and "seek the same remedies." Ford contends COCA correctly recognized the claims Plaintiffs assert do *not* arise from the same course of conduct or seek the same remedies. To illustrate, Ford contends the evidence shows Cuesta knew of the alleged defect before he bought his vehicle, but paid a price which he believed took the defect and cost of repair into consideration. It also contends Cuesta experienced the "return to idle" condition more than 100 times with the pre-March 2001 pedal, but most of the class has yet to experience such problem at all with it. Defendants also discuss the fact that Plaintiff Golden has very favorable feelings about his truck, despite the defective pedal, which should somehow place his position as a class representative at odds with the remainder of the class. Ford notes that Plaintiff Golden continued to use his vehicle after discovering the alleged defect which raises certain defenses undermining typicality.

¶ 23 We find Defendants' arguments regarding different factual scenarios as to Dr. Cuesta and the rest of the class as to pedal replacement and experiencing the "go to idle" condition to be unavailing. Manifestation of the defect is not required for certification. See *Daffin v. Ford Motor Company,* 458 F.3d 549 (6th Cir.2006); see gen., *Ysbrand,* 2003 OK 17, ¶ 4, 81 P.3d 618, 623. Additionally, the record indicates Dr. Cuesta made numerous trips to the Ford dealership to complain about the accelerator pedal. It was finally replaced with Ford's assistance at **Dr. Cuesta's own expense** after he filed this lawsuit. We also hold that these circumstances do not take Dr. Cuesta out of the class definition, i.e., as one whose vehicle "contains" the defective pedal. To determine that these circumstances makes Dr. Cuesta atypical from the rest of the class, or to find he does not adequately represent the class, is

---

18. *Masquat v. DaimlerChrysler Corporation,* 2008 OK 67, ¶ 12, 195 P.3d 48, 53, quoting *Ysbrand,* 2003 OK 17, ¶ 21, 81 P.3d at 627.

19. "It is not required that 'class members share every factual and legal predicate to meet the commonality and typicality standards.'" *Ysbrand,* 2003 OK 17, ¶ 21, 81 P.3d at 627, quoting *Newton v. Merrill Lynch,* 259 F.3d 154, 183 (3rd Cir.2001).

to hold him liable for Ford's failure to replace the defective pedal at an earlier time. Moreover, the replacement cost of the pedal is still owed to Dr. Cuesta, similar to all other class members.

¶ 24 Plaintiffs also contend COCA erred by conducting an improper merits inquiry and making findings based on contested facts in favor of Defendants. COCA found Cuesta abused or abnormally used the pedal, distinguishing his use from that of other potential class members. However, Plaintiffs claim that Cuesta's alleged misuse was not a "fact." Moreover, they contend COCA found the "latent" defect experienced by the class representatives was "exceedingly rare," and thus, not typical of the class, because only about 1% of the warranty claims related to an acceleration problem.

¶ 25 Ford contends that some inquiry into the merits at the class certification stage is appropriate to the extent the merits overlap the Rule 23 criteria, citing federal cases and cases from this Court.[20] We acknowledge that some consideration of the merits is acceptable only "insofar as they inform what individual issues might be a part of the adjudicatory process." *Masquat*, 2008 OK 67, ¶ 10, 195 P.3d 48, 53, citing Steven S. Gensler, *Civil Procedure: Class Certification and the Predominance Requirement under Oklahoma Section 2023(B)(3)*, 56 Okla. L.Rev. 289, 316 (2003).

¶ 26 Williams responds that COCA explained how the trial court improperly considered the merits, while also noting that Oklahoma law requires a "rigorous analysis" of each class action prerequisite which involves considerations of the factual and legal issues comprising the plaintiff's cause of action, *citing General Tel. Co. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) and *Perry v. Meek*, 1980 OK 151, 618 P.2d 934. Williams also asserts that such analysis requires more than the trial court's "uncritical acceptance" of Plaintiffs' arguments which prompted COCA's discussion of countervailing evidence on "typicality" and

contends the court must identify and review the "core liability issues" asserted by the class, citing *Harvell v. Goodyear Tire & Rubber Co.*, 2006 OK 24, 164 P.3d 1028, which cites *Scoufos v. State Farm Fire & Casualty Co.*, 2001 OK 113, 41 P.3d 366 and *KMC Leasing, Inc. v. Rockwell–Standard Corp.*, 2000 OK 51, 9 P.3d 683.

¶ 27 The record on appeal reflects that the trial court and COCA made some improper findings based on disputed facts by addressing the merits of this case. The trial court determined that Ford's engineers "discovered that a design gap existed behind the pedal bracket of the AC pedals, which they believed allowed the pedal to bend under overload forces and resulted in the pedal generating out-of-range voltages." The trial court implied that the removal of the bracket and gap, contained in the design of all three of the Williams' fixed pedals, the BA, BB and AC, led to the alleviation of the "go to idle" condition because Ford's engineers testified the gap should not have been included in any of the designs. Actually, Ford engineer Greg West testified that although he did not believe the gap should be there, he also stated that they did not see a benefit to the overload protection within the pedal after eliminating the gap in the design.

¶ 28 COCA's opinion refers to Ford's defenses which include that Dr. Cuesta experienced the return to idle because he abused or abnormally used the accelerator pedal in his truck. COCA then held that "[t]hese facts suggest at a minimum that Appellees' claims will not be typical of claims made by class members legitimately claiming their vehicles are unreasonably unsafe or unfit for their intended purpose, as required for the breach of implied warranty of merchantability and strict liability claims." COCA also determined that the record suggests that "only 1% of drivers experienced the defect." However, Ford engineer Greg West testified that as of September, 2003, Ford had received 10,246 complaints relating to Williams' fixed pedals installed in Super Duty trucks from October,

---

**20.** Ford cites *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 24 (1st Cir. 2008); *Dukes v. Wal–Mart, Inc.*, 509 F.3d 1168, 1178, n. 2 (9th Cir.2007); and *Harvell v. Good-*

*year Tire & Rubber Co.*, 2006 OK 24, ¶ 11, 164 P.3d 1028, 1032–33; *KMC Leasing v. Rockwell–Standard Corp.*, 2000 OK 51, ¶ 20, 9 P.3d 683, 690.

2000 through November, 2002. When asked, he stated he did not know if they had enough information to determine what percentage of that number were due to pedal overload. However, he subsequently said that from reviewing the data, his "assumption" was less than 1%.[21] All of these issues are fact questions for a jury.[22]

## CONCLUSION

¶ 29 We find the class action is a proper means of addressing these defects, as the estimated cost of a replacement pedal is $185.00. If successful, class members will be able to replace the pedals in their trucks as part of a class action, whereas pursuing lawsuits on their own would prove too costly.

It permits plaintiffs to 'vindicat[e] the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost.'

*Ysbrand*, 2003 OK 17 ¶ 6, 81 P.3d 618, 623–624, quoting *Deposit Guar., Nat'l Bank v. Roper*, 445 U.S. 326, 338, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980).

¶ 30 The trial court found the prerequisites for class action were met in this case. In so finding, the court did not abuse its discretion. COCA erred in reversing the certification order. We affirm the order as to class certification for the breach of warranty claims only. The other theories of recovery, i.e., for negligence and strict products liability, are not included in the certification for the reasons mentioned above.

**OPINION OF THE COURT OF CIVIL APPEALS IS VACATED; ORDER OF THE TRIAL COURT IS AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THE VIEWS EXPRESSED IN THIS OPINION.**

EDMONDSON, C.J., HARGRAVE, OPALA, KAUGER, WATT, COLBERT, REIF, JJ., concur.

TAYLOR, V.C.J., WINCHESTER, J., Dissent.

---

**21.** We note that this number of 10,246, relating to warranty complaints of customers, does not quantify the entire proposed class for whom the defect has not manifested itself.

**22.** An investigation was conducted by the National Highway Traffic Safety Administration (NHTSA). Plaintiffs and Defendants both acknowledge the investigation was closed. However, the significance of that fact is disputed. This is also a jury question. NHTSA's report, dated February 10, 2005, included in Williams' exhibits contained in its Certification Hearing Bench Book provides, in part:
*REASON FOR CLOSING:*
. . .

[I]n light of Ford's field service action and other steps to address accelerator control concerns, ODI [Office of Defects Investigation] has determined that further investigation or action would not represent an efficient use of limited agency resources or significantly improve vehicle safety. Accordingly, ODI will close the investigation. **The closing of the investigation does not constitute a finding by NHTSA that a safety-related defect does not exist, and should not be considered as having any precedential value or effect binding the agency in future defect investigations.** NHTSA will take further action if warranted by future circumstances. [emphasis added].